UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

FILED

AUG 3 1 2009

USDC WP SDNY

09 CIV. 7584

JUDGE MARRERO

---

PLUMBERS & STEAMFITTERS LOCAL 267 PENSION
FUND and GREGORY LANCETTE, BRADLEY WARD,
BRYAN ALLEN, DAVID WABY, DONALD A. LITTLE, JR.,
JAMES FREDENBURG, PETER LAUZE, FRANK BISESI,
DONALD BECKLEY, PATRICK BONNELL, DOMINIC
MANCINI, and JAMES ROOD as Trustees of the PLUMBERS
& STEAMFITTERS LOCAL 267 PENSION FUND on behalf of
themselves and all others similarly situated,

                                    Plaintiffs,

                      v.

J.P. JEANNERET ASSOCIATES, INC., JOHN P. JEANNERET,
PAUL L. PERRY, IVY ASSET MANAGEMENT LLC,
LAWRENCE SIMON, HOWARD WOHL, ADAM L. GEIGER,
JEFFREY R. LINDENBAUM, JOHN D. ROGERS, SEAN C.
SIMON, KEVIN J. BANNON, STEVEN PISARKIEWICZ,
ROBERT MESCHI, SUSAN RABINOWITZ, MICHAEL
SINGER, ALAN CHUANG, GREGORY VAN INWEGEN,
SEAN CUMISKEY, STUART DAVIES, PETER ROSE,
JOSEPH BURNS, MARK SANTERO, PETER D. NORIS,
FARZINE HACHEMIAN, SCOTT E. WENNERHOLM,
JONATHAN LITTLE, RONALD P. O'HANLEY, and BANK
OF NEW YORK MELLON CORPORATION,

                                    Defendants.

Case No.

**JURY TRIAL DEMANDED**

---

# CLASS ACTION COMPLAINT
## FOR VIOLATIONS OF FEDERAL SECURITIES LAW,
## ERISA AND VIOLATIONS OF COMMON LAW

Plaintiffs Plumbers & Steamfitters Local 267 Pension Fund (the "Fund") and Gregory

Lancette, Bradley Ward, Bryan Allen, David Waby, Donald A. Little, Jr., James Fredenburg, Peter

Lauze, Frank Bisesi, Donald Beckley, Patrick Bonnell, Dominic Mancini, and James Rood, as

Trustees of the Plumbers & Steamfitters Local 267 (collectively, the "Plaintiffs") allege, on

personal knowledge as to themselves and the Fund's own investment, and on information and

belief based on, *inter alia*, investigations and interviews made by Plaintiffs' counsel, complaints filed respectively by the United States Department of Justice ("DOJ") and Securities and Exchange Commission (the "SEC"), and reports and interviews published in the financial press, as follows:

## BACKGROUND

1.     This is a class action on behalf of all persons and entities who, between January 1996 and the present (the "Class Period"), retained Defendant J.P. Jeanneret Associates, Inc. and/or Ivy Asset Management LLC, to provide investment advisory services and, as a result, were invested in Bernard L. Madoff Investment Securities, LLC ("BMIS") and suffered losses arising from the Bernard Madoff ("Madoff") fraud.  Plaintiffs seek to recover damages on behalf of all Class Members resulting from defendants' (as defined herein) violations of federal securities laws, the Employee Retirement Income Security Act of 1974 ("ERISA") and common law, as alleged herein.

2.     This case arises from a massive, fraudulent scheme perpetrated by Madoff through his investment firm, BMIS, and others, which was facilitated by the Defendants, who in breach of fiduciary duties owed to Plaintiffs and other members of the Class caused and permitted the Fund's assets to be invested with Madoff.

3.     On December 10, 2008, Madoff informed his sons that his investment advisory business, BMIS, was a complete fraud.  Madoff stated that he was "finished," that he had "absolutely nothing," and that "it's all just one big lie."  He confessed he had been running "basically, a giant Ponzi scheme."  Madoff admitted that the business had been insolvent for years.  Madoff also stated that he estimated the losses from his fraud to be approximately $50 billion.  Published reports now indicate that Madoff's estimate may be conservative.

4.    On December 11, 2008, Madoff was arrested by federal authorities for operating a multi-billion dollar Ponzi scheme, in which Madoff used money invested by new clients to pay the fictitious "returns" of other clients. Madoff and BMIS were criminally charged with securities fraud by the United States Attorney's Office for the Southern District of New York, and on March 12, 2009, Madoff pled guilty to all eleven criminal charges, admitting in court that he operated a Ponzi scheme. On June 29, 2009, Madoff was given a maximum sentence of 150 years in prison.

5.    Madoff was unable to perpetrate this fraud by himself. Numerous funds of funds, investment advisors, auditors, and others – including the Defendants – facilitated Madoff's fraud and committed their own violations of law by investing billions of dollars of their clients' money with Madoff and his related entities while knowing that they were not performing their respective duties. They did so by, among other things, (a) employing a scheme to defraud potential investors by (i) disseminating correspondence and presentations that contained false or misleading statements regarding the investment strategies and objectives of BMIS and their familiarity with those "strategies" based on their due diligence, and (ii) issuing account statements, financial reports and other devices to perpetuate their scheme to defraud their clients; (b) engaging in a course of business which operated as a fraud or deceit upon the investor clients; and (c) breaching their fiduciary duties with regard to (i) due diligence and (ii) monitoring of Madoff and BMIS (*e.g.*, the performance of Madoff's trading strategy) despite the existence of tremendous red flags.

6.    As a result of Defendants' false assurances in the Investment Management Agreement (described herein), financial reports, and other documents about, their due diligence

and their actual failure to conduct due diligence into Madoff and/or BMIS, Plaintiffs' and the putative Class' investments in Madoff and/or BMIS have been stolen.

7.     During the Class Period, Defendant J.P. Jeanneret Associates, Inc. ("Jeanneret Associates"), the Investment Manager of the Fund, issued false statements or omitted certain facts, it was duty bound to disclose in its Investment Management Agreements that, as Investment Manager, regarding its initial and ongoing due diligence over the investment strategy of Madoff to whom Fund assets were allocated.

8.     To bolster its credibility, Jeanneret Associates leveraged the pedigree of Defendant Ivy Asset Management Corp., (and its successor in interest, Ivy Asset Management, LLC, hereinafter "Ivy")[1] a registered investment adviser that offered high net-worth individuals and institutional clients alternative investment vehicles.  These representations created an appearance of financial sophistication and exclusivity that the Jeanneret and Ivy defendants purported to offer their potential clients.  This image was cultivated by defendants with the purpose and effect of inducing investors to invest with BMIS in reliance on, *inter alia*, the purportedly sound investment strategy and high standard of due diligence exercised by the Jeanneret and Ivy Defendants.

9.     In fact, Ivy was at the heart of the scheme to collect substantial management fees from Plaintiff and Class members by acting as the portal through which Jeanneret's clients and others placed assets under Madoff's management.  Ivy abandoned its duties because investing with Madoff was lucrative in that his consistent profits and inflated returns were structured to provide lucrative fees to feeders such as Ivy.  Madoff did not receive a "cut" of the advisory fees, foregoing them purportedly to make the fee on the supposed ongoing, but in fact, non-existent

---

[1] Ivy was acquired by and became a wholly owned subsidiary of Defendant Bank of New York Mellon Corp. ("BONY").

trades. Over more than a decade, Ivy orchestrated this scheme by omitting to disclose to Plaintiffs and the Class that it was not able to perform its oversight function in breach of its duties as investment adviser and was not conducting the represented and paid for due diligence. Jeanneret Associates, which was also enticed by the prospect of millions of dollars in management and incentive fees that it would not have to share with Madoff so long as it likewise abandoned its fiduciary obligations to Plaintiffs and other Class members.

10.    During the Class Period, defendant Jeanneret Associates represented to Plaintiffs and the Class that it would be able to fulfill its professional and fiduciary duties to manage the capital that Plaintiffs and other Class members entrusted to its discretion while knowing, or recklessly disregarding the fact, that it could not fulfill these obligations with respect to the Fund's assets invested with Madoff. Nevertheless, Defendant Jeanneret continued to mislead Plaintiffs and the Class members and blindly entrusted Plaintiffs' capital to Madoff and BMIS, who used that capital in a massive Ponzi-scheme. Jeanneret Associates failed to perform proper due diligence, failed to exercise due care in managing investments, and/or concealed from Plaintiffs and the Class the fact that it was not actively overseeing and safeguarding investments made by Plaintiffs and the Class.

11.    Plaintiffs and other members of the Class remitted the investment adviser fees to Jeanneret Associates and Ivy so that Jeanneret Associates and Ivy would vet suitable investment managers, assemble a diversified group of investments, follow a professional investment strategy, and conduct ongoing due diligence in accordance with the representations made to Plaintiffs and the Class members. Defendants Jeanneret and Ivy utterly ignored their contractual, statutory, and common law duties. Additionally, defendants Jeanneret and Ivy, pursuant to a

consulting agreement, shared in undisclosed and prohibited fees that were appropriated from Plaintiffs and other Class members' investments unjustly enriching those defendants.

12.     As detailed herein, the Jeanneret and Ivy Defendants unfairly, unlawfully and deceptively neglected and/or abandoned their professional responsibilities and failed to conduct even minimal due diligence on Madoff's investment strategy, failed to follow a sustainable investment strategy, and failed to conduct ongoing oversight in order to identify and avoid this massive fraud.

## JURISDICTION AND VENUE

13.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337, §§ 10(b), 20(a), and 27 of the Exchange Act, 15 U.S.C. §§ 78aa, 78j and 78t(a), and Rule l0b-5, 17 C.F.R. § 240.10b-5, promulgated thereunder by the SEC, as well as the common law, and pursuant to the supplemental jurisdiction of this Court, 28 U.S.C. § 1367.

14.     This Court also had jurisdiction over the subject matter of this action pursuant to §§ 409, 502(a)(2) & (3), and 502(e) of the Employee Retirement Income Security Act ("ERISA"), as amended, 29 U.S.C. §§ 1109, 1132(a)(2) & (3), 1132(e).

15.     Venue is proper in this District pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, 28 U.S.C. § 1391(b), and 29 U.S.C. § 1132(e)(2).  Substantial acts in furtherance of the alleged fraud and other wrongdoing and/or their effects occurred within this District, and many of the Defendants reside in and/or maintain principal executive offices in this District.

16.     In connection with the acts and omissions alleged in this Complaint, Defendants, directly or indirectly, used the mail and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## PARTIES

17.    Plaintiff Plumbers & Steamfitters Local 267 Pension Fund, a fund maintained for the benefit of members of the Plumbers & Steamfitters U.A. Local 267, invested $10,536,000 with BMIS through Defendants, during the Class Period as set forth in the attached certification. Local 267 is a local union of workers representing all aspects of the plumbing and pipefitting industry and covering the geographical areas of Onondaga, Cortland, Chemung, Schuyler and Tompkins counties in New York. Local 267's membership includes the Plaintiffs listed below and over 1,000 other skilled tradesmen and tradeswomen who have been financially injured as a result of the conduct alleged herein.

18.    Plaintiff Gregory Lancette serves as a Trustee of the Board of Trustees of the Fund. As a Trustee of the Local 267 Funds, Plaintiff Greg Lancette is a fiduciary with respect to the Local 267 Pension Fund within the meaning of 29 U.S.C. § 1002(21). He is also a participant in the Local 267 Pension Fund within the meaning of 29 U.S.C. § 1002(7). Plaintiff Gregory Lancette's address is 150 Midler Park Drive, Syracuse, New York 13206.

19.    Plaintiff Bradley Ward serves as a Trustee of the Board of Trustees of the Fund. As a Trustee of the Local 267 Funds, Plaintiff Brad Ward is a fiduciary with respect to the Local 267 Pension Fund within the meaning of 29 U.S.C. § 1002(21). He is also a participant in the Local 267 Pension Fund within the meaning of 29 U.S.C. § 1002(7). Plaintiff Bradley Ward's address is 150 Midler Park Drive, Syracuse, New York 13206.

20.    Plaintiff Bryan Allen serves as a Trustee of the Board of Trustees of the Fund. As a Trustee of the Local 267 Funds, Plaintiff Bryan Allen is a fiduciary with respect to the Local 267 Pension Fund within the meaning of 29 U.S.C. § 1002(21). He is also a participant in the Local 267 Pension Fund within the meaning of 29 U.S.C. § 1002(7). Plaintiff Bryan Allen's address is 701 West State Street, Ithica, NY 14850.

21.      Plaintiff David Waby serves as a Trustee of the Board of Trustees of the Fund. As a Trustee of the Local 267 Funds, Plaintiff David Waby is a fiduciary with respect to the Local 267 Pension Fund within the meaning of 29 U.S.C. § 1002(21).  He is also a participant in the Local 267 Pension Fund within the meaning of 29 U.S.C. § 1002(7).  Plaintiff David Waby's address is 8 Fairway Drive, Auburn, NY 13021.

22.      Plaintiff Donald A. Little, Jr. serves as a Trustee of the Board of Trustees of the Fund. As a Trustee of the Local 267 Funds, Plaintiff Donald A. Little, Jr. is a fiduciary with respect to the Local 267 Pension Fund within the meaning of 29 U.S.C. § 1002(21).  He is also a participant in the Local 267 Pension Fund within the meaning of 29 U.S.C. § 1002(7).  Plaintiff Donald A. Little, Jr.'s address is 109 Belshire Lane, Syracuse, NY 13208.

23.      Plaintiff James Fredenburg serves as a Trustee of the Board of Trustees of the Fund. As a Trustee of the Local 267 Funds, Plaintiff James Fredenburg is a fiduciary with respect to the Local 267 Pension Fund within the meaning of 29 U.S.C. § 1002(21).  He is also a participant in the Local 267 Pension Fund within the meaning of 29 U.S.C. § 1002(7).  Plaintiff James Fredenburg's address is 1680 Berry Road, Lafayette, NY 13084.

24.      Plaintiff Peter Lauze serves as a Trustee of the Board of Trustees of the Fund. As a Trustee of the Local 267 Funds, Plaintiff Peter Lauze is a fiduciary with respect to the Local 267 Pension Fund within the meaning of 29 U.S.C. § 1002(21).  He is also a participant in the Local 267 Pension Fund within the meaning of 29 U.S.C. § 1002(7).  Plaintiff Peter Lauze's address is 900 Old Liverpool Road, Suite 17, Liverpool, 13088.

25.      Plaintiff Donald Beckley serves as a Trustee of the Board of Trustees of the Fund. As a Trustee of the Local 267 Funds, Plaintiff Donald Beckley is a fiduciary with respect to the Local 267 Pension Fund within the meaning of 29 U.S.C. § 1002(21).  He is also a participant in

the Local 267 Pension Fund within the meaning of 29 U.S.C. § 1002(7). Plaintiff Donald

Beckley's address is 1525 Lake Street, PO Box 205, Elmira, NY 14902.

26.    Plaintiff Patrick Bonnell serves as a Trustee of the Board of Trustees of the Fund.

As a Trustee of the Local 267 Funds, Plaintiff Patrick Bonnell is a fiduciary with respect to the

Local 267 Pension Fund within the meaning of 29 U.S.C. § 1002(21). He is also a participant in

the Local 267 Pension Fund within the meaning of 29 U.S.C. § 1002(7). Plaintiff Patrick

Bonnell's address is 1004 Sullivan Street, Elmira, NY 14902.

27.    Plaintiff Dominic Mancini serves as a Trustee of the Board of Trustees of the

Fund. As a Trustee of the Local 267 Funds, Plaintiff Dominic Mancini is a fiduciary with respect

to the Local 267 Pension Fund within the meaning of 29 U.S.C. § 1002(21). He is also a

participant in the Local 267 Pension Fund within the meaning of 29 U.S.C. § 1002(7). Plaintiff

Dominic Mancini's address is 615 South Avenue, Rochester, NY 14620.

28.    Plaintiff James Rood serves as a Trustee of the Board of Trustees of the Fund. As

a Trustee of the Local 267 Funds, Plaintiff James Rood is a fiduciary with respect to the Local

267 Pension Fund within the meaning of 29 U.S.C. § 1002(21). He is also a participant in the

Local 267 Pension Fund within the meaning of 29 U.S.C. § 1002(7). Plaintiff James Rood's

address is 400 Leavenworth Avenue, Syracuse, NY 13204.

29.    Defendant Jeanneret Associates is a New York corporation established in 1988

with its principal place of business in Syracuse, New York. Jeanneret Associates is a registered

investment advisor under the Investment Advisors Act that provides investment advice for a fee

to Taft-Hartley funds and other institutional investors. Jeanneret Associates has been the

Investment Manager for the Fund since November 1990.

30.     Defendant John P. Jeanneret, Ph.D., ("Jeanneret") is the founder, president, chief executive officer and chief compliance officer of Jeanneret Associates. Jeanneret holds a Bachelor of Arts degree in Economics and Accounting, a Master of Arts in Economics and Business, and a doctorate in Philosophy, Economics and Finance, all from the State University of New York at Binghamton. Jeanneret has been a registered investment advisor, the SEC since 1973. Jeanneret provides investment advice for a fee to Taft-Hartley funds and other institutional investors and invested his clients' money into BMIS.

31.     Defendant Paul L. Perry ("Perry") is the director and owner of Jeanneret Associates. Perry holds a Bachelor of Science in Finance and Quantitative Analysis from New York University. Prior to his position at Jeanneret Associates, Perry was a Financial Consultant for Shearson Lehman Hutton and Gruntal and Company, Inc. Perry provides investment advice for a fee to Taft-Hartley funds and other institutional investors and invested his clients' money into BMIS. Defendants John P. Jeanneret, J.P. Jeanneret Associates, and Paul L. Perry are hereinafter, collectively referred to as the "Jeanneret Defendants."

32.     At all relevant times, Jeanneret Associates and the Jeanneret Defendants served as investment manager to ERISA covered pension plans within the meaning of ERISA § 3(38), 29 U.S.C. § 1002(38), and, by virtue of the Jeanneret Defendants' discretionary authority and control respecting management of ERISA covered employee benefit plans, the Jeanneret Defendants were fiduciaries to members of the ERISA Class pursuant to ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

33.     Defendant Ivy Asset Management LLC was formerly a Delaware corporation that reorganized as a Delaware limited liability company on January 1, 2009. Ivy is located at One Jericho Plaza, Jericho, New York, 11753, and is a wholly owned subsidiary of The Bank of New

York Mellon Corporation. Ivy is a registered Investment Adviser under the Investment Advisers Act of 1940 and a commodity trading advisor under the Commodity Exchange Act. The Jeanneret Defendants were introduced to BMIS and Madoff through Ivy Asset Management and developed a long-term relationship with Defendant Ivy during which the two shared investment advisor fees.

34.    Defendant Lawrence Simon ("Larry Simon") was a co-founder of Ivy and served as Chief Executive Officer and President of Defendant Ivy from approximately January 1984 to January 2006 when he became Vice Chairman of Ivy, a position he held until at least February 2007. He also served on Ivy's Board of Directors from October 2000 to November 2006. During the Class Period, Larry Simon, together with other key officers and board members of Ivy, exercised ultimate control of and discretion over the investment advice, oversight, and administrative services that Ivy provided to clients generally and, on information and belief, in connection with the investment advice provided to Class members causing them to place their assets with Madoff and BMIS. When Ivy was sold to BONY in 2000, Defendant Simon received a tremendous sum and significant percentage of the sale price.

35.    Defendant Howard Wohl ("Wohl") was a co-founder of Ivy and served as Chairman of Defendant Ivy from approximately January 1984 to October 2000, after which point when he assumed the post as Ivy's Vice Chairman. Wohl also served as Chief Investment Officer from approximately October 1996 to October 2000. He served on Defendant Ivy's Board of Directors from October of 2000 until November of 2006. During the Class Period, Wohl, together with other key officers and board members of Ivy, exercised ultimate control of and discretion over the investment advice, oversight, and administrative services that Ivy provided to clients generally and, on information and belief, in connection with the investment advice to

Class members causing them to place their assets with Madoff and BMIS. When Ivy was sold to BONY in 2000, Defendant Wohl received a tremendous sum and significant percentage of the sale price.

36.     Defendant Adam L. Geiger ("Geiger") served as Director of Investments of Defendant Ivy from approximately 1999 to April 2002, and Managing Director and Head of Investments from April 2002 to January 2006. He also served on Ivy's Strategic Operating Committee from approximately March 2005 until December 2005. Geiger also was Chief Investment Officer and a member Manager Approval Committee until at least May 2006. The Manager Approval Committee was responsible for overseeing manager research and selection, portfolio management, operational due diligence and risk management. During the Class Period, Geiger, together with other key officers and board members of Ivy, exercised control of and discretion over the investment advice, oversight, and administrative services that Ivy provided to clients generally and, on information and belief, in connection with the investment advice provided to to Class members causing them to place their assets with Madoff and BMIS.

37.     Defendant Jeffrey R. Lindenbaum ("Lindenbaum") served as Chief Financial Officer of Defendant Ivy from before 2000 until March of 2001. During the Class Period, Lindenbaum, together with other key officers and board members of Ivy, exercised control of and discretion over the investment advice, oversight, and administrative services that Ivy provided to clients generally and, on information and belief, in connection with the investment advice provided to Class members causing them to place their assets with Madoff and BMIS.

38.     Defendant John D. Rogers ("Rogers") served as Director, Products and Markets of Defendant Ivy from July of 2000 to April of 2002; Managing Director, Products and Markets, from April of 2002 until March of 2003; and Managing Director, Investment Products Group

from March of 2003 until on or after the end of March 2004. During the Class Period, Rogers, together with other key officers and board members of Ivy, exercised control of and discretion over the investment advice, oversight, and administrative services that Ivy provided to clients generally and, on information and belief, in connection with the investment advice provided to Class members causing them to place their assets with Madoff and BMIS.

39.    Defendant Sean C. Simon ("Sean Simon") served from April of 2002 to January of 2006 as Managing Director and Head of Global Client Development and Global Client Services of Defendant Ivy, and as co-President from January of 2006 until January of 2009, when he was named CEO of Defendant Ivy. During that time he also served as a member of Defendant Ivy's Board of Directors. From approximately March of 2005 until approximately December of 2005, Sean Simon also served as a member of Ivy's Strategic Operating Committee and co-chaired Defendant Ivy's Executive Committee. From approximately May of 2006 to the present he also served on Defendant Ivy's Manager Approval Committee (subsequently renamed the Investment Committee). He was an advisory member with veto power of the Investment Committee (together with Defendant Singer) from approximately April of 2007 through the end of 2008. Simon is Defendant Lawrence Simon's son and was promoted to co-President after his father stepped down to Vice Chairman in January 2006. During the Class Period, Sean Simon, together with other key officers and board members of Ivy, exercised control of and discretion over the investment advice, oversight, and administrative services that Ivy provided to clients generally and, on information and belief, in connection with the investment advice provided to Class members causing them to place their assets with Madoff and BMIS.

40.    Defendant Kevin J. Bannon ("Bannon") served as a member of the Board of Directors of Defendant Ivy from sometime prior to March 31, 2004 until approximately April of

2007, during which time he also served as Chief Investment and Member of the Investment Committee of Ivy's parent, the Bank of New York. During the Class Period, Bannon, together with other key officers and board members of Ivy, exercised control of and discretion over the investment advice, oversight, and administrative services that Ivy provided to clients generally and, on information and belief, in connection with the investment advice provided to Class members causing them to place their assets with Madoff and BMIS.

41.    Defendant Steven Pisarkiewicz ("Pisarkiewicz") served as Chairman of the Board Directors of Defendant Ivy from July of 2003 until approximately April of 2007. During the Class Period, Pisarkiewicz, together with other key officers and board members of Ivy, exercised control of and discretion over the investment advice, oversight, and administrative services that Ivy provided to clients generally and, on information and belief, in connection with the investment advice provided to Class members causing them to place their assets with Madoff and BMIS.

42.    Defendant Robert Meschi ("Meschi") served as Manager of Research of Defendant Ivy from January of 2000 until April of 2002, Assistant Vice President from October of 2000 until April of 2002, Director, Investments from April of 2002 until approximately May of 2006, and a member of Ivy's Manager Approval Committee from approximately December 7, 2005 until approximately May of 2006. During the Class Period, Meschi, together with other key officers and board members of Ivy, exercised control of and discretion over the investment advice, oversight, and administrative services that Ivy provided to clients generally and, on information and belief, in connection with the investment advice provided to Class members causing them to place their assets with Madoff and BMIS.

43.    Defendant Susan Rabinowitz ("Rabinowitz") served as Vice President of Investments of Defendant Ivy from about 2003 until approximately the end of March 2004. During the Class Period, Rabinowitz, together with other key officers and board members of Ivy, exercised control of and discretion over the investment advice, oversight, and administrative services that Ivy provided to clients generally and, on information and belief, in connection with the investment advice provided to Class members causing them to place their assets with Madoff and BMIS.

44.    Defendant Michael Singer ("Singer") served from before March of 2005 until approximately December of 2005 as Managing Director and Chief Administrative Officer if Defendant Ivy, a member of its Strategic Operating Committee, and a member of its Manager Approval Committee (subsequently renamed the Investment Committee). He was an advisory member with veto power of the Investment Committee (together with Defendant Sean Simon) from approximately April of 2007 through the end of 2008. From approximately January of 2006 until approximately December of 2008, he served as co-President of Defendant Ivy with responsibilities that included, *inter alia*, legal and compliance, risk management, and hedge fund manager operational due diligence. During that time he also served on the Board of Directors of Defendant Ivy. During the Class Period, Singer, together with other key officers and board members of Ivy, exercised control of and discretion over the investment advice, oversight, and administrative services that Ivy provided to clients generally and, on information and belief, in connection with the investment advice provided to Class members causing them to place their assets with Madoff and BMIS.

45.    Defendant Alan Chuang ("Chuang") served as Director of Investments and Head of Portfolio Management of Defendant Ivy from approximately January of 2006 until

approximately May of 2006 and during that time was a member of Ivy's Manager Approval Committee. During the Class Period, Chuang, together with other key officers and board members of Ivy, exercised control of and discretion over the investment advice, oversight, and administrative services that Ivy provided to clients generally and, on information and belief, in connection with the investment advice provided to Class members causing them to place their assets with Madoff and BMIS.

46.    Defendant Gregory van Inwegen ("van Inwegen") served as Director, Investments Quantitative Research and Risk Management and a Member of the Management Approval Committee (subsequently renamed the Investment Committee) of Defendant Ivy from approximately January 2, 2007 until approximately March 18, 2008 when he became Managing Director and Chief Investment Risk Officer of Defendant Ivy. He continued to serve in that capacity, as a member of Defendant Ivy's Investment Committee and as the chair of Ivy's Risk Management Committee and the leader of its Risk Management and Quantitative Research Team beyond the end of 2008. During the Class Period, van Inwegen, together with other key officers and board members of Ivy, exercised control of and discretion over the investment advice, oversight, and administrative services that Ivy provided to clients generally and, on information and belief, in connection with the investment advice provided to Class members causing them to place their assets with Madoff and BMIS.

47.    Defendant Sean Cumiskey ("Cumiskey") served as Managing Director, head of the Investment Strategies Group and the Capital Markets Coverage Team, as well as serving as a member of the Manager Approval Committee (subsequently renamed the Investment Committee) of Defendant Ivy from January of 2006 until after December of 2008. He was a member of Defendant Ivy's Executive Committee from approximately March of 2008 through

the end of 2008. During the Class Period, Cumiskey, together with other key officers and board members of Ivy, exercised control of and discretion over the investment advice, oversight, and administrative services that Ivy provided to clients generally and, on information and belief, in connection with the investment advice provided to Class members causing them to place their assets with Madoff and BMIS.

48. Defendant Stuart Davies ("Davies") served as Managing Director, Investments, Head of Investments in Europe and Asia and Member of the Manager Approval Committee (subsequently renamed the Investment Committee) of Defendant Ivy from about January of 2006, and member of the Investment Risk Committee (from May of 2006) until about January of 2007 when he became Global Head of Investments with responsibility for Ivy's investment philosophy, portfolio strategy and asset allocation. He served in this capacity and continued to serve as a member of Ivy's Manager Approval Committee (subsequently renamed the Investment Committee) and a Member of Defendant Ivy's Executive Committee from about March of 2008 until sometime before January 9, 2009. During the Class Period, Davies, together with other key officers and board members of Ivy, exercised control of and discretion over the investment advice, oversight, and administrative services that Ivy provided to clients generally and, on information and belief, in connection with the investment advice provided to Class members causing them to place their assets with Madoff and BMIS.

49. Defendant Peter Rose ("Rose") served as Director of Investments and Head of Investment Research for Europe and Asia and member of the Manager Approval Committee of Defendant Ivy from about January of 2006 until approximately February of 2007. During the Class Period, Rose, together with other key officers and board members of Ivy, exercised control of and discretion over the investment advice, oversight, and administrative services that Ivy

provided to clients generally and, on information and belief, in connection with the investment advice provided to Class members causing them to place their assets with Madoff and BMIS.

50.    Defendant Joseph Burns ("Burns") served as Director of Investments and Head of Long/Short Equity of Defendant Ivy from approximately January of 2006 until December of 2006. In December 2006, he became Managing Director, Investments and Head of Investments, Europe and Asia where he served until after December 2008. Throughout that time period he also served on Defendant Ivy's Manager Approval Committee (subsequently renamed the Investment Committee). During the Class Period, Burns, together with other key officers and board members of Ivy, exercised control of and discretion over the investment advice, oversight, and administrative services that Ivy provided to clients generally and, on information and belief, in connection with the investment advice provided to Class members causing them to place their assets with Madoff and BMIS.

51.    Defendant Mark Santero ("Santero") served as Managing Director, Investments responsible for coordinating Research, Risk Management, and Portfolio Management of Defendant Ivy from approximately January of 2006 until approximately February of 2007. During that period he also served as a member of Defendant Ivy's Manager Approval Committee. During the Class Period, Santero, together with other key officers and board members of Ivy, exercised control of and discretion over the investment advice, oversight, and administrative services that Ivy provided to clients generally and, on information and belief, in connection with the investment advice provided to Class members causing them to place their assets with Madoff and BMIS.

52.    Defendant Peter D. Noris ("Noris") served as Chief Investment Officer of Defendant Ivy from approximately February 20, 2007 until sometime after March 18, 2008.

Beginning about April 2007 and for the balance of his tenure, he chaired Defendant Ivy's

Investment Committee. Beginning approximately March 18, 2008 until the end of his tenure,

Noris also served as a member of the Defendant Ivy's Executive Committee and its Investment

Risk Management Committee. During the Class Period, Noris, together with other key officers

and board members of Ivy, exercised control of and discretion over the investment advice,

oversight, and administrative services that Ivy provided to clients generally and, on information

and belief, in connection with the investment advice provided to Class members causing them to

place their assets with Madoff and BMIS.

53.    Defendant Farzine Hachemian ("Hachemian") served as Director, Investments

and a member of its Investment Committee of Defendant Ivy from approximately May 2007

until approximately December 2008. Beginning approximately March 2008, he headed

Defendant Ivy's Portfolio Management Group and became a member of the Investment Risk

Management Committee of Defendant Ivy and held those positions until at least sometime after

December of 2008. During the Class Period, Hachemian, together with other key officers and

board members of Ivy, exercised control of and discretion over the investment advice, oversight,

and administrative services that Ivy provided to clients generally and, on information and belief,

in connection with the investment advice provided to Class members causing them to place their

assets with Madoff and BMIS.

54.    Defendant Scott E. Wennerholm ("Wennerholm"), from approximately March 18,

2008 until sometime after December of 2008, served on Ivy's Board of Directors. During the

Class Period, Wennerholm, together with other key officers and board members of Ivy, exercised

control of and discretion over the investment advice, oversight, and administrative services that

Ivy provided to clients generally and, on information and belief, in connection with the

investment advice provided to Class members causing them to place their assets with Madoff and BMIS.

55.     Defendant Jonathan Little ("Little"), from approximately March 18, 2008 until sometime after December of 2008, served on Ivy's Board of Directors. During the Class Period, Little, together with other key officers and board members of Ivy, exercised ultimate control of and discretion over the investment advice, oversight, and administrative services that Ivy provided to clients generally and, on information and belief, in connection with the investment advice provided to Class members causing them to place their assets with Madoff and BMIS.

56.     Defendant Ronald P. O'Hanley ("O'Hanley"), from approximately March 18, 2008 until sometime after December of 2008, served on Ivy's Board of Directors. During the Class Period, O'Hanley, together with other key officers and board members of Ivy, exercised control of and discretion over the investment advice, oversight, and administrative services that Ivy provided to clients generally and, on information and belief, in connection with the investment advice provided to Class members causing them to place their assets with Madoff and BMIS.

57.     Defendant Ivy, together with the individual defendants, Larry Simon, Howard Wohl, Adam Geiger, Jeffrey R. Lindenbaum, John D. Rogers, Sean C. Simon, Kevin J. Bannon, Steven Pisarkiewicz, Robert Meschi, Susan Rabinowitz, Michael Singer, Alan Chuang, Gregory van Inwegen, Sean Cumiskey, Stuart Davies, Peter Rose, Joseph Burns, Mark Santero, Peter D. Noris, Farzine Hachemian, Scott E. Wennerholm, Jonathan Little, and Ronald P. O'Hanley (the "Individual Ivy Defendants") are referred to collectively as the "Ivy Defendants."

58.     The advice of Defendant Ivy and the Individual Ivy Defendants who determined investment advice given by Ivy was provided under such circumstances that both Ivy and the

Individual Ivy Defendants were fiduciaries within in the meaning of ERISA § 3(21)(A)(ii), 29

U.S.C. § 1002(21)(A)(ii) and 29 CFR §2510.3-21(c).  Due to Ivy's expertise and the reliance

placed on them by the Jeanneret Defendants, as a practical matter these decisions were controlled

by Ivy Asset Management and the Individual Defendants who determined the investment advice

given by Ivy such that these Defendants were also *de facto* fiduciaries within the meaning of

ERISA § 3(2I)(A)(i), 29 U.S.C. § 1002(3)(21)(A)(i), because they exercised authority or control

over the management and disposition of plan assets.

59.    Defendant The Bank of New York Mellon Corporation ("BONY") is a Delaware

corporation headquartered at One Wall Street, New York, New York 10286.  According to its

Form 10-K for the year ending December 31, 2008, BONY "is a global financial services

company headquartered in New York, New York, with approximately $928 billion in assets

under management and $20.2 trillion in assets under custody and administration."  BONY is the

parent company of Ivy Asset Management, having acquired the Company in 2000.  According to

Ivy Management's website, BONY and Ivy Asset Management have a "synergistic" relationship:

> Given the size of our infrastructure, we believe we have the
> resources to deliver the best quality work and produce the highest
> quality products.  This is further enhanced by the relationship with
> our parent company, The Bank of New York Mellon
> Corporation.  As a leading financial institution with the resources to support our
> institutional enterprise, the bank is equally committed to
> maintaining our entrepreneurial and performance-driven culture.
> The result has been a mutually beneficial, synergistic affiliation.

60.    Defendants Dr. Jeanneret, Perry, Jeanneret Associates, Ivy, the Individual Ivy

Defendants and BONY, are collectively referred to herein as "Defendants."

## CLASS ACTION ALLEGATIONS

61.    Plaintiffs bring this class action pursuant to Federal Rules of Civil Procedure

23(a) and (b)(3) on behalf of all persons and entities who were, either directly or indirectly,

provided with investment advisory services by J.P. Jeanneret Associates and/or Ivy at any time

from January 1, 1996 through the present and who suffered damages as a result of the Jeanneret

Defendants' and Ivy Defendants' decision to invest assets with Madoff and BMIS (the "Class").

Excluded from the Class are Defendants, officers and directors of the Defendants, members of

their immediate families and their legal representatives, heirs, successors, or assigns, and any

entity in which Defendants have or had a controlling interest.

62.     Plaintiffs also bring this action on behalf of a sub-class comprised of all

fiduciaries, participants and beneficiaries of any employee benefit plan covered by ERISA who,

pursuant to the investment advice provided by the Jeanneret Defendants and/or Ivy Defendants

invested with BMIS at any time through the present (the "ERISA Class").  At all relevant times

J.P. Jeanneret Associates has been investment advisor to a number of employee benefit plans

(after the effective date of the Pension Protection Act) over whose assets it exercised total

discretion.  As such, the investment of those assets is subject to the provisions of ERISA.

Excluded from the ERISA Subclass are defendants, their officers, employees, directors, partners,

and members of the immediate families of any of the foregoing, or any of their heirs, successors

or assigns.

63.     At times throughout this Complaint, where allegations concern only the ERISA

sub-class, they will be identified as pertaining to the "ERISA Class."

64.     This action is properly maintainable as a class action because:

a.     The members of the proposed Class are dispersed geographically and are

so numerous that joinder of all Class members is impracticable.  While the exact number of

Class members is unknown to Plaintiffs at this time and can be ascertained only through

appropriate discovery, Plaintiffs believe that Class members number in the hundreds, if not thousands;

        b.     Plaintiffs' claims are typical of those of all members of the Class because all have been similarly affected by Defendants' actionable conduct in violation of the federal securities laws, ERISA and New York state and common law as alleged herein. Moreover, the ERISA Class' claims are typical of those of the ERISA Class because (1) to the extent that Plaintiffs seek relief on behalf of the employee benefit plans covered by ERISA that invested in BMIS pursuant to § 502(a)(2) of ERISA their claims are not only typical of, but the same as a claim under this section brought by any other ERISA Class member; (2) to the extent that Plaintiffs seek relief under ERISA § 502(a)(3) for equitable relief, that relief would affect all class members equally; all of the ERISA Class members were injured and continue to be injured in the same manner by Defendants' breaches of fiduciary duty.

        c.     Plaintiffs will fairly and adequately protect the interests of the Class and have retained counsel competent and experienced in class action securities and ERISA litigation. Plaintiffs have no interests antagonistic to, or in conflict with, the Class that Plaintiffs seek to represent;

        d.     The questions of law and fact common to the members of the Class predominate over any questions affecting individual members of the Class. Among the questions of law and fact common to the Class are:

            i.     whether Defendants' acts and/or omissions as alleged herein violated the federal securities laws;

            ii.     whether Defendants' conduct alleged herein violated the Investment Advisors Act;

iii. whether Defendants' representations to Plaintiffs and the other Class members misrepresented and/or omitted material facts;

iv. whether Defendants acted with knowledge or with reckless disregard for the truth in misrepresenting and/or omitting material facts;

v. whether Defendants' conduct alleged herein was intentional, reckless, or grossly negligent or in violation of fiduciary and other duties owed to Plaintiffs and the Class; and

vi. to what extent the members of the Class have sustained damages and the proper measure of damages.

e. With respect to the ERISA Class, the case presents numerous common questions of law and fact, including:

i. Did the Jeanneret Defendants or the Ivy Defendants, exercise control over employee benefit plan assets covered by ERISA;

ii. Were the Jeanneret Defendants, the Ivy Defendants or BONY, fiduciaries within the meaning of ERISA as a result of their roles with respect to the investments made by the Fund;

iii. Did the Jeanneret Defendants, the Ivy Defendants or any of them, breach their fiduciary duties under ERISA by, *inter alia*, (a) causing or allowing monies to be invested and with Madoff; or (b) failing to adequately investigate the soundness and suitability of investing with Madoff;

iv. Were ERISA Class members harmed by the breaches of fiduciary duty, committed by the Jeanneret Defendants, the Ivy Defendants or any of them as described herein;

v.     Are ERISA Plaintiffs and the ERISA Class entitled to recover losses from Jeanneret Defendants, the Ivy Defendants or any of them caused by their breaches of fiduciary duty, in order to recover lost assets on behalf of the employee benefit plans they serve or in which they participate;

f.     A class action is superior to other available methods for the fair and efficient adjudication of the claims asserted herein because joinder of all members is impracticable. Furthermore, because the damages suffered by individual members of the Class may be relatively small, the expense and burden of individual litigation make it virtually impossible for Class members to redress the wrongs done to them. The likelihood of individual Class members prosecuting separate claims is remote; and

g.     Plaintiffs anticipate no unusual difficulties in the management of this action as a class action.

65.     Class action status in the this action is warranted and appropriate under Rule 23(b)(1)(B) for the ERISA Class because prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to individual members of the Class that would, as a practical matter, be dispositive of the interests of the other members not parties to these actions, or substantially impede their ability to protect their interests.

66.     Class action status is also warranted under the other subsections of Rule 23(b) because (1) prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendants; (2) Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole; and (3) questions of law or fact common to members of the Class predominate over any

questions affecting only individual members and a class action is superior to the other available methods for the fair and efficient adjudication of this controversy.

67.     Plaintiffs will fairly and adequately protect the interests of the members of the Class. Plaintiffs have retained competent counsel, experienced in class actions, securities

## SUBSTANTIVE ALLEGATIONS

**A.    Summary of Allegations**

68.     On March 12, 2009, Madoff pled guilty to eleven counts in the criminal information filed by the United States Attorney's Office, including a count of securities fraud in violation of Title 17, C.F.R. § 240.10b-5, admitting that he perpetrated a fraud since the early 1990s (prosecutors charged that the fraud began in the early 1980s). In his plea allocution, Madoff admitted that he never invested his investment advisory clients' funds in securities, that he never employed the split-strike conversion strategy he touted, and that he never had custody of the securities he purportedly held for his investment advisory clients.

69.     Madoff also admitted that he caused to be created and sent to his clients, false trading confirmation and client account statements that reflected bogus transactions and positions. Prosecutors charged that Madoff hired numerous employees with little or no prior pertinent training or experience in the securities industry to perform these and other "back office" functions. Madoff admitted that he knew that the audited financial statements he filed with the SEC were false and misleading. On June 29, 2009, Madoff was given a maximum sentence of 150 years in prison.

70.     On March 18, 2009 the United States Attorney's Office charged Madoff's accountant David Friehling ("Friehling") of Friehling & Horowitz, CPAs, P.C., with securities fraud, aiding & abetting investment-adviser fraud, and four counts of filing false audit reports with the Securities & Exchange Commission. The criminal information alleges that Friehling

did not conduct a meaningful audit of BMIS under the required Generally Accepted Auditing Standards ("GAAS") or in conformity with Generally Accepted Accounting Principles ("GAAP"), that he falsely certified audited financial statements for BMIS, including balance sheets, statements of income, statements of cash flows and reports of internal control, and that he lacked the requisite independence to audit BMIS in a manner consistent with the industry's professional standards.

71.    In order to keep the Ponzi scheme running, Madoff needed money from new investors. Notwithstanding, Madoff limited the number of investors he would deal with directly. Madoff's select list of investors included funds managed by, among others, the Jeanneret Defendants.

72.    Defendants, through the use of investment advisory contracts and other devices, defrauded investors by representing their ability to perform supervisory and due diligence functions over the assets that they placed with Madoff while knowing that secrecy was a cardinal rule of Madoff and he would not allow scrutiny of, nor even access to, his operations. By the assurances, Defendants induced Plaintiffs and Class Members into investing with them while concealing their failure to carry out the due diligence they promised.

**B.    The Jeanneret and Ivy Defendants**

73.    At all relevant times Jeanneret Associates served as Plaintiffs' Investment Manager and did so for other similarly situated Class members.

74.    In the late 1980's, Defendant J.P. Jeanneret met Defendant Lawrence Simon of Ivy Asset Management in a restaurant in upstate New York. The Jeanneret Defendants and the Ivy Defendants at that time began discussing placement of clients' assets with Madoff's investment management services.

75.    Defendant Simon, the former President and CEO of Ivy Asset Management introduced Defendant Jeanneret Associates in 1989 to Madoff.  Defendant Simon introduced many other investors who comprise the Class to Madoff.

76.    By that time, Defendant J.P. Jeanneret had established J.P. Jeanneret Associates and was providing investment management services to, *inter alia,* union clients such as Plaintiff and other Class members.

**The Ivy Agreement**

77.    On May 15, 1991, Jeanneret Associates and Ivy entered into an investment consulting agreement ("Ivy Agreement").  Jeanneret Associates and Ivy agreed to the following terms.

- Ivy agreed to make available to Jeanneret, its "sources of information and contacts with investment managers" (*i.e.* Madoff).

- Jeanneret agreed to provide Ivy with a list of its clients whose assets would be placed with investment managers recommended by Ivy.  Jeanneret agreed to update this list periodically and Ivy agreed to keep the list confidential. Jeanneret also agreed to provide Ivy with copies of the investment management agreements that Jeanneret executed with its clients.

- Ivy agreed to (a) research, identify, monitor, evaluate and meet with potential investment managers; (b) recommend investment managers to Jeanneret; (c) advise Jeanneret as to the availability of opportunities to invest Client funds with particular investment managers; (d) monitor, evaluate and meet with investment managers that are managing Client funds invested through Jeanneret; (e) assess the performance of investment managers managing Client funds invested through Jeanneret and make periodic recommendations with respect to such performance; (f) maintain such records as are mutually deemed appropriate by Ivy and Jeanneret relating to the recommendation, retention, performance and services of investment managers recommended to Ivy and selected by Jeanneret to manage the Client funds invested through Jeanneret; and

      (g) provide Jeanneret with such documentation as it reasonably requires with respect to investments of Client funds with investment managers such that Jeanneret may maintain compliance with the record-keeping requirements of the Advisers Act.

-   As compensation for its services, Ivy received 50% of management fees collected by Jeanneret in connection with the funds invested with investment managers introduced to Jeanneret by Ivy.

-   Jeanneret agreed to maintain at least two clients who invest with investment managers introduced to them by Ivy, and a minimum total investment of $4,000,000.

-   Ivy agreed to use reasonable care in providing its services but disclaimed liability to Jeanneret for acts and omissions by any investment manager that it recommended, and any matter arising out of or in connection with the agreement, except for matters arising out of Ivy's gross negligence or willful misconduct.

(1991 Ivy Agreement, at pp. 1-3). The impetus behind Jeanneret Associates' engagement of Ivy for these services was primarily, if not exclusively, based upon Ivy's relationship with Madoff. Although both Jeanneret Associates and Ivy knew, or should have known, that they would be unable to perform their duties of monitoring and due diligence with respect to assets placed with Madoff, Ivy functioned as the gateway through which Jeanneret blindly entrusted Plaintiffs' and other Class members' assets under Madoff's management. As a result, both Jeanneret Associates and Ivy collected millions of dollars in management fees while representing to Plaintiffs and other Class members that they were carrying out their duties as investment managers and fiduciaries. Moreover, the terms of the 1991 Ivy Agreement, in particular, the fee-sharing provision and Ivy's disclaimer of liability for acts and omissions of its recommended investment managers, were not disclosed to Plaintiffs or other Class members. Upon information and belief, Ivy earned 50% of management fees from other investment managers that it placed with Madoff.

78.     As described below in Section E *infra*, when investing with Madoff investment managers and investment advisers were precluded from meaningful oversight or control over Madoff's activities.  As such, the Jeanneret Defendants and Ivy Defendants, had a duty to either (a) follow through with their duties of oversight and demand transparency of Madoff, or (b) withdraw their clients' assets from BMIS entirely in the event they were denied access to this necessary information.  The Ivy and Jeanneret Defendants did neither.  Instead, they continued to receive investment management and incentive fees, thereby conducting themselves in a self-interested manner and inconsistent with their ERISA and common law duties as fiduciaries.  The Jeanneret and Ivy Defendants abrogated their duties as ERISA fiduciaries to Plaintiff and other ERISA Class members, and their common law fiduciary duty to all Class members.

**Jeanneret Associates' Investment Management Agreements**

79.     Under the Discretionary Investment Management Agreement with the Fund, Jeanneret Associates' duties as the Investment Manager are defined as follows:

> [J.P. Jeanneret Associates, Inc. is] the [Local 267] Board's attorney-in-fact to invest and reinvest the assets received and deposited with the custodian . . . for investment by the Investment Manager, and/or to appoint other investment advisors *subject to the Investment Manager's oversight* to invest and reinvest such assets, as fully as the Board itself could do.  The Investment Manager hereby accepts this appointment, hereby acknowledges that it is a fiduciary with respect to the Plan, and *agrees to supervise and direct the investment of the assets* of the Plan in accordance with (i) the written investment guidelines [. . .] and, (ii) the current funding policy and method that have been established to carry out the objectives of the Plan as communicated to the Investment Manager.
>
> Subject to the attached Investment Guidelines, the Investment Manager and/or any investment advisors appointed by the Investment Manager and subject to its supervision may, in its full discretion and without obligation on its part to give prior notice to the Board, (a) buy, sell, exchange, convert and otherwise trade in any stocks, bonds and other securities, and (b) establish and

execute security transactions, through accounts with such brokers or dealers as the Investment manager and/or any appointed investment advisor may select, except to the extent otherwise directed by the Board; provided however, that all such activities shall be conducted in a manner consistent with the Investment Guidelines, the Investment Manager's obligations hereunder, and the requirements of the Employee Retirement Income Security Act of 1974, as amended (the "Act") [. . .]

The Investment Manager further certifies that it is an "Investment manager" as that term is defined in Section 3(38) of the Act.

(July 1, 1996 Discretionary Investment Management Agreement between Local 267 Pension Fund and J.P. Jeanneret Associates, hereinafter the "1996 Agreement", at 1) (emphasis added). Therefore, by the terms of its contract with Local 267, Jeanneret Associates was an ERISA fiduciary. Upon information and belief, other members of the ERISA Class also retained Jeanneret Associates under substantially similar Investment Management Agreements, establishing fiduciary relationships with Jeaneret Associates.

80.    The Investment Management Agreement further stated that Jeanneret:

shall perform its duties [. . .] with the care, skill, prudence, and diligence, under the circumstances then prevailing, [. . .] and shall diversify the Investment Account Assets so as to avoid the risk of large losses . . .

(See 1996 Agreement at 2).

81.    Finally, the Investment Guidelines reiterated Jeanneret Associates' duty to

[S]atisfy all other provisions as to fiduciary standards and obligations required by the Act and/or the Plan.

(1996 Agreement at 8).

82.    Pursuant to the 1991 Ivy Agreement, Jeanneret provided Ivy with copies of the Investment Management Agreement with Plaintiffs and other Class members. As such, Ivy, in providing investment advice to Plaintiffs and other ERISA Class members, assumed duties of an ERISA fiduciary. Because Jeanneret Associates' investment decisions vis-à-vis Plaintiffs' and

other Class Members' assets were largely based on Ivy's investment recommendations pursuant

to its consulting agreement with Jeanneret, Ivy functioned as the *de facto* fiduciary for Plaintiffs

and other ERISA Class members whose employee benefit plans are governed by ERISA.

83.     Upon information and belief, the financial reports that Jeanneret Associates

disseminated to Plaintiffs and other Class members contained material misrepresentations and

omissions that were directed by Ivy as a result of its monitoring and recordkeeping duties under

the 1991 Ivy Agreement with Jeanneret.

84.     In blatant disregard for their contractual, statutory and common law duties, the

Jeanneret and/or Ivy Defendants placed millions of dollars of Plaintiffs' and Class members'

assets into the Madoff Ponzi scheme during the Class Period, while falsely representing that they

were capable of performing, and in fact did perform, ongoing oversight and due diligence.

85.     Relying exclusively on Madoff's reputation for abnormally strong returns,

Jeanneret abandoned its duties of initial and ongoing due diligence of his investment strategies.

In fact, Defendants Jeanneret and  Perry of Jeanneret Associates and Defendant Larry Simon

made frequent representations to Plaintiffs and the Class regarding the consistent positive

performance of Madoff's strategy and that it was less risky with higher returns. (*See, e.g.*, Local

267 Pension Fund Board of Trustees' Meeting Minutes dated Aug. 12, 1999, at 3).  In reality, the

Jeanneret Defendants and Ivy Defendants had no reasonable basis to believe that Madoff's

investment strategy was capable of such results.

86.     In fact, Larry Simon and the Ivy Defendants had especially compelling reasons to

question the results being reported by Madoff.  Ivy performed administrative and book-keeping

functions for clients who invested with Madoff and other investment managers recommended by

Ivy.  In performance of these functions, Ivy had access to the falsified account statements and

fabricated trade confirmation tickets that BMIS generated in furtherance of the Ponzi scheme.

Defendant Larry Simon and Ivy knew or should have known (had they exercised reasonable

diligence) that Madoff and BMIS were engaged in a fraudulent scheme.

87.    Finally, Ivy purported to disavow any responsibility arising from losses incurred

as a result of Jeanneret's clients investing with Madoff and other investment managers that it

recommended.  This is a strong indication that Defendant Larry Simon and Ivy knew, or had

reason to doubt the veracity of Madoff's returns.  Nevertheless, the Jeanneret and Ivy Defendants

continued to place their clients' assets with BMIS enticed by the lucrative and atypical

commission arrangement that Madoff offered.

**C.    The Jeanneret and Ivy Defendants Ignored the
Red Flags Pointing Towards Madoff's Fraud Because Their
Relationship With Madoff Benefitted Them Financially**

88.    The Jeanneret and Ivy Defendants' selection of Madoff as an outside investment

manager– despite the abundance of red flags regarding Madoff and BMIS leads to only one of

three possibilities: (a) the Jeanneret and Ivy Defendants conducted no due diligence whatsoever;

(b) Jeanneret and Ivy Defendants' due diligence was so recklessly deficient that they didn't

discover the red flags, or (c) their due diligence uncovered these red flag warnings but these

defendants ignored them.  In their desire to generate substantial fees, the Jeanneret and Ivy

Defendants breached their fiduciary and contractual duties owed to Plaintiffs and the Class.

89.    The Jeanneret and Ivy Defendants were experienced investment professionals and

registered investment advisers. They knew the appropriate level of due diligence required of

them as it was plainly set out in the Discretionary Investment Management Agreements, the

1991 Ivy Agreement between Jeanneret and Ivy, and provisions under ERISA.  Nonetheless,

they intentionally failed to perform the required due diligence and instead remained recklessly, if not willfully, blind to the numerous red flags which would have revealed the Madoff fraud.

90.    The Jeanneret Defendants lulled would-be investors into a false sense of security by engendering the false impression that (i) Jeanneret Associates had a factual basis for its representations with respect to the hedging strategy employed by Madoff and, (ii) that indeed, Jeanneret Associates itself exercised control over the portofolio's level of risk exposure. Jeanneret Associates made the following representations regarding its investment philosophy:

> This is a basic hedged equity portfolio strategy. Stocks are purchased based upon significant weighting in the S&P 100 Stock Index. This causes our portfolio of stocks to increase and decrease in a fashion almost identical to the Index. The portfolio is maintained at a 90% or greater correlation to the S&P 100 Stock Index at all times. The portfolio is hedged by purchase of S&P 100 Index puts approximately 1% under the then current Index level. This portfolio put protection is effective <u>at all times</u>. In addition, index calls are sold against the portfolio, which are fully covered, approximately 2% above the existing index level. This allows for approximately 1.50% per month (18% annualized) upside potential for the equity portfolio while simultaneously providing excellent downside protection. The result has been results significantly in excess of the S&P Index, with much less volatility.
>
> *    *    *    *    *
>
> We control risk by maintaining put protection on the portfolio at all times. These put assets increase significantly in value if the S&P Index declines, thus lessening downside risk of the stock portfolio. We have developed risk measurements and adhere to those measurements.

(Response to Request for Proposal from Local 267 dated August 29, 1995, at 2) (Emphasis in original.)  Substantially similar representations were made to other Class members.

91.    The Jeanneret Defendants knew or should have known that they were unable to verify whether Madoff was in fact employing the above-stated strategy and knew or should have known that they could exercise no control over the degree of risk Madoff's purported investment

strategy would entail. In fact, the Jeanneret Defendants also knew or should have known that Ivy also lacked the necessary access to Madoff's operations that would allow it to perform its duties as Jeanneret's investment consultant pursuant to its contract with Jeanneret.

92.    The Jeanneret and Ivy Defendants chose to (i) keep Ivy's purported disclaimer of liability concealed from Plaintiffs and Class members, and (ii) lead members of the Class to believe that it had actually verified the reported results of the hedged equity strategy and exercised a level of control over the investment strategy so as to avoid undue risk. In truth, the Jeanneret and Ivy Defendants' decision to invest in Madoff was not informed by an independent evaluation of the veracity of the strategy and results reported by Madoff, nor did the Jeanneret and Ivy Defendants apprise themselves of the actual risks attending Madoff's operations. They simply functioned as a pass-through to Madoff for which they collected substantial fees as investment advisors.

93.    The only cogent explanation for the Jeanneret and Ivy Defendants' failure to learn, or ignorance of, the myriad red flags identified above is that they were content to collect substantial fees from Plaintiff and Class members using their long-term relationship with Madoff and BMIS. Therefore, in reckless disregard for the truth, they did not conduct any meaningful due diligence that would have uncovered the red flags because doing so would have required them to end their lucrative relationship with Madoff and/or the entities he owned and controlled.

94.    As Harry Markopolos ("Markopolos"), a derivatives expert with experience managing the split-strike conversion strategy, testified before Congress, because Madoff was only compensated through the commissions he charged from the trades he purportedly executed for his investors, funds-of-funds managers had a strong financial incentive to invest with Madoff:

> [Investment Managers] were paid so much to look the other way.
> . . . Mr. Madoff was purporting to only be taking commissions

from this product. Even though he was a fund manager, who
usually would take a one percent management fee and 20 percent
of the profits, he was so generous as a human being that he was
offering those fees to the feeder funds to lure in new victims.

*       *       *

To deliver 12 percent annual return, he needed to be earning a 16
percent gross, because there were four percent in fees. And he was
passing the four percent in fees along to the feeder funds and
keeping only a smidgen for himself.

And so those feeder funds were incentivized not to ask the
questions, to be willfully blind, if you will, and not get too
intrusive into the Madoff scheme.

(Markopolos Testimony, Feb. 4, 2009).

95.     The Attorney General for the State of New York, in the civil action against Ezra

Merkin (a fund manager who also invested heavily with Madoff), alleges the same financial

incentive that Merkin responded to in his decision to invest the Ariel and Gabriel funds with

Madoff as follows:

Merkin's incentive to invest Ariel and Gabriel funds with Madoff
is clear from the compensation arrangements he had with the other
managers: of the outside managers he used, Madoff was the
cheapest, since Madoff charged no management fee or incentive
fee, and simply took a $0.04 per share brokerage commission
already built into the reported stock and option prices for Madoff's
trades. Thus, on the Madoff portion of the portfolio, for doing
almost nothing, Merkin could keep his full 20% incentive fee in
addition to the 1% management fee – a much better deal for
Merkin even than Ascot, where he took only a 1% to 1.5%
management fee. In contrast, Cerberus charged Merkin an annual
management fee of 1% for the assets it managed, plus an annual
incentive fee of 9% of profits. Cohanzick received an annual
management fee of 1% plus an incentive fee of 10% less the
current money market return. Thus, the assets given to Cerberus
yielded Merkin only an 11% incentive fee after paying Cerberus's
9% fee, and Cohanzick even less.

(*Cuomo v. Merkin*, Civ. No. 450879/2009, at ¶ 80.)

96. The Jeanneret and Ivy Defendants were unjustly enriched as a result of their relationship with Madoff. In addition to collecting the fees foregone by Madoff, the Jeanneret Defendants also collected management and incentive fees set forth in the investment management agreements.

97. The Jeanneret and Ivy Defendants received millions of dollars in improper fees in connection with the assets invested with Madoff.

98. Pursuant to the Ivy Agreement, Jeanneret also had the incentive to maintain a loyal contingency of its clients invested with Madoff because if the number of Jeanneret clients invested with Ivy-recommended managers dropped below 2, Ivy would be entitled to receive 60% of the investment management fees as opposed to 50%. This perverse incentive articulates itself a breach of a fiduciary's duty of loyalty as it further caused Jeanneret to act in its self-interest and ignore its duties of due diligence and prudence that, if observed, would have avoided the massive losses suffered by the Class.

## D.   BONY's Role

99. Defendant BONY acquired Ivy Asset Management, a privately-held asset management firm, in part, to market its pool of clientele which included Taft-Hartley pension plans such as Plaintiffs. *See* Press Release: The Bank of New York Co., Inc. Agrees to Acquire Ivy Asset Management, Aug. 9, 2000, PRNewswire; Press Release: The Bank of New York Co., Inc. Completes Acquisition of Ivy Asset Management, Oct. 4, 2000, PRNewswire. In 2000, Ivy touted that it caters to Taft-Harley pension plans on its website.

100. BONY had actual knowledge of Ivy's relationship with Madoff and knew or should have known of Ivy's inability to effectively oversee and conduct appropriate due diligence of Madoff's operations and performance. BONY was also undoubtedly aware of the

lucrative fees that Ivy was enjoying by being a Madoff conduit at the time BONY completed the acquisition of Ivy on October 4, 2000.

101.    After the acquisition, BONY continued to market Ivy as a primary player in its portfolio of asset managers servicing pension funds. For example, in a 2006 BONY publication, *Improving Pension Liability Management with Liability Benchmarks,* BONY lists Ivy Asset Management as a member of its asset management team, BNY Mellon Asset Management.

102.    In July 2007, through the merger of The Bank of New York Company, Inc. and Mellon Financial Corporation of Pittsburgh, the Bank of New York Mellon (hereinafter "BNY Mellon") was formed.

103.    According to BNY Mellon's website, BNY Mellon Asset Management is "The 'umbrella organization' for all of the company's affiliated investment management firms and *is responsible* for U.S. and non-U.S. retail, intermediary and institutional distribution of investment management and related services."

104.    BNY Mellon Asset Management, consistent with BONY's initial impetus for acquiring Ivy, specifically identified itself as a provider of investment services to Taft-Hartley pension plans. Its website describes its service as follows:

> The unique approach of BNY Mellon Asset Management's Taft-Hartley Group brings together the strengths of each of the specialty investment management firms and channels them *through a single point of contact.* This approach ensures a sustained level of excellent client service combined with strong, consistent investment performance. Working with our group offers your benefit funds broader management diversification while saving on administration.

105.    Unlike the opaque wall behind which Madoff operated, BNY Mellon Asset Management represented that its affiliated investment firms "provide asset management service

that is responsive to our clients' needs, *transparent in its processes*, and consistently working to pursue strong performance and results for clients."

106.    Ivy was subject to the leadership, supervision and control of Vice Chairman, President and Chief Executive Officer at BNY Mellon Asset Management, Ronald P. O'Hanley III.

107.    Beginning in March 2008, O'Hanley sat on the Board of Directors of Ivy and is currently a manager of Ivy Asset Management LLC.  Straddling the management line between parent BONY and BONY's subsidiary, Ivy, O'Hanley was in a position of direct influence and control over the nature of investment advice and oversight that Ivy provided to its clients such as Taft-Hartley pension plans.  In fact, O'Hanley communicated to the public a unitary vision of BNY Mellon Asset Management under which Ivy was subsumed:

> Founded on the principle of independent thought, research, and entrepreneurship, we believe there is no other asset management business in the world that has BNY Mellon Asset Management's breadth of product offering.  We also recognize the need to bring our clients the right product at the right time, and the importance of supporting our clients and their advisors throughout their relationship with us.  Our structure allows us to bring our capabilities to our clients individually or through strategic combinations.

108.    Therefore, BONY, through O'Hanley, took an active role in steering pension fund clients to Ivy Asset Management had the power and actual influence to exercise complete control over Ivy's conduct regarding the advisory and due diligence duties it owed to the Fund.

109.    A further indication of BONY's absolute control over Ivy's operations is the fact that applicants to Ivy's employment opening were linked to BONY's career opportunities website and placed through BONY's interview process.

110.    BONY exercised its control over Ivy, specifically with respect to Ivy's Madoff

holdings, from the date of the purchase.  In making the decision to acquire Ivy in 2000, BONY

examined and evaluated Ivy's own holdings with Madoff and apparently forced Ivy to divest

those interests before acquiring the firm in October.  A statement made by BONY in its 10-K

filed for FY 2008 betrays its pre-existing reservations about Madoff that counseled in favor of

liquidating Ivy's investments with Madoff:

> On Dec. 11, 2008, Bernard L. Madoff was arrested by the FBI and
> sued by the SEC for engaging in a massive "Ponzi-scheme"
> investment fraud through his broker dealer and investment
> advisory company, [BMIS].  [BONY] has no direct exposure to the
> Madoff fraud.  *[Ivy], a subsidiary that primarily manages funds-
> of-hedge-funds has not had any funds-of-funds investments with
> Madoff since 2000.*  Several investment managers contracted with
> Ivy as a sub-advisor and one pension fund contracted with Ivy as
> investment manager; a portion of these funds were invested with
> Madoff and likely suffered losses as a result of the Madoff fraud.

(Bank of New York, 10-K for FY 2008, at 29) (emphasis added).

111.    BONY had actual or constructive knowledge of Ivy's relationship with Madoff

and Jeanneret.  BONY's due diligence of Ivy, in the period leading up to its acquisition of Ivy,

must have raised the same red flags noted by so many investment managers who avoided

investing with Madoff.  In its own self-interest, BONY caused Ivy to divest its Madoff

investments.  Nevertheless, BONY continued to allow Ivy to advise other fund managers to place

their money with Madoff because it directly benefitted from the millions of dollars in advisory

and incentive fees Ivy earned as a result of Madoff's Ponzi-scheme.

112.    Following its acquisition of Ivy, year after year, BONY reported growth in its

asset management service and the concomitant revenues in asset management fees. *See* Form

10-K for FY 2000, filed March 29, 2001, at 3; Form 8-K filed July 17, 2003; Form 10-Q for

period ended June 30, 2002, filed on August 14, 2002; Form 10-Q for period ended June 30,

2003, filed on August 16, 2003; Form 10-Q for period ended September 30, 2003, filed on November 12, 2003; Form 10-K for FY 2003, filed on March 10, 2004, at 4. Year after year, BONY specifically cited to Ivy's growth and success, all the while knowing, or recklessly ignoring, the fact that a substantial part of its revenues were the direct result of what is now known as history's largest and most far-reaching Ponzi scheme. BONY's pecuniary interest in allowing Ivy to advise its fund managers to invest with Madoff overrode the better judgment that it exercised with respect to its subsidiary's own investments in Madoff that it liquidated.

**E.    Failure to Conduct Adequate Due Diligence**

113.    The Jeanneret and Ivy Defendants owed fiduciary duties to Plaintiffs and other Class members. Plaintiffs' and other Class members' assets were entrusted to their care and they owed fiduciary duties of good faith, fair dealing and due care to the Fund's beneficiaries. They knew, or, in the exercise of due care in discharging their fiduciary duties, were reckless in not knowing that Madoff was engaged in a massive Ponzi scheme, or, at a minimum, was reporting results that could neither be verified nor explained. Despite being alerted to the fraud, or having enough information to be put on notice of a probable fraud, they knowingly and willfully invested the Fund's assets in BMIS or other Madoff entities. They had fiduciary obligations to oversee, monitor and protect the investments of the Fund, which they utterly failed to fulfill.

114.    Fiduciaries and plan participants of employee funded pension plans often look to the financial knowledge and expertise of professional investment managers such as the Jeanneret and Ivy Defendants to provide them with the best possible allocation of capital that will ensure a stable income while minimizing the risk of large losses. In order to protect plan assets, investment managers are expected to conduct due diligence to ensure that the outside managers continue to meet the selection criteria. Investment managers also have a duty to closely monitor

the performance of the underlying investments and to verify the information reported by the outside managers.

115.     Contrary to the provisions of the Discretionary Investment Management Agreements and representations of ongoing oversight, monitoring and due diligence over their clients' assets, the Jeanneret and Ivy Defendants, without appropriate due diligence or oversight, entrusted the assets of the Fund to investment vehicles or brokerage accounts that could be and were, disposed of entirely at the discretion and under the control of Madoff and BMIS. These assets were not in any sense committed to any investment guideline or managed pursuant to any standard of care, let alone the heightened standard of prudence that was required of Defendants under ERISA.

**F.     Defendants Willfully Ignored Dozens of Warning Signs**
**That Madoff's Operations Were Not Legitimate**

116.     At the root of Defendants' culpable conduct is the fact that Madoff unabashedly operated behind a shroud of secrecy that Defendants had to necessarily accede to, in order to place the Fund's assets under his management.   As described in § C *supra*, Defendants had a pecuniary interest in accepting Madoff's *modus operandi* in total disregard of their duties as investment managers and fiduciaries because Madoff only collected commissions on the purported trades he executed, thereby leaving a greater portion of the Fund's assets from which Defendants collected their respective percentages of fees.  As a result, Defendants willfully ignored myriad warning signs that Madoff was operating a fraud.  By failing to conduct due diligence on Madoff's operations, or if conducted, a proper one, Defendants breached their fiduciary and contractual duties to Plaintiffs and the Class, engaged in a course of business that operated as a fraud upon Plaintiff and Class members, and caused their statements regarding

their ongoing due diligence and oversight of outside investment managers to be materially false and misleading.

a.    Madoff Publicly Spoke of Secrecy:  Madoff perpetuated the secrecy in his public statements.  As reported in May 2001, in an article titled, "Madoff Tops Charts; Skeptics Ask How," appearing in *MAR/Hedge*, a semi-monthly newsletter reporting on the hedge fund industry (hereinafter, "*MAR/Hedge* article"): "'[Madoff] won't reveal how much capital is required to be deployed at any given time to maintain the strategy's return characteristics, but does say that 'the goal is to be 100% invested.'"  Additionally, "[a]s for the specifics of how the firm manages risk and limits the market impact of moving so much capital in and out of positions, Madoff responds first by saying, 'I'm not interested in educating the world on our strategy, and I won't get into the nuances of how we manage risk.'"

b.    When MAR/Hedge probed into the substance of Madoff's strategy, Madoff deflected the question and invoked his reputation as an industry professional; "Madoff, who believes that he deserves 'some credibility as a trader for 40 years,' says: 'The strategy is the strategy and the returns are the returns.'  He suggests that those who believe there is something more to it and are seeking an answer beyond that are wasting their time."

c.    On May 7, 2001, *Barron's* published an article titled "Don't Ask, Don't Tell: Bernie Madoff is so secretive, he even asks his investors to keep mum."  In that article, author Erin E. Arvedlund wrote: "The lessons of Long-Term Capital Management's collapse are that investors need, or should want, transparency in their money manager's investment strategy.  But Madoff's investors rave about his performance – even though they don't understand how he does it.  'Even knowledgeable people can't really tell you what he's doing,' one very satisfied investor told Barron's.  'People who have all the trade confirmations and statements still can't

define it very well.' . . . This investor declined to be quoted by name. Why? Because Madoff politely requests that his investors not reveal that he runs their money."

        d.      "When *Barron's* asked Madoff how he accomplishes this, he says, 'It's a proprietary strategy. I can't go into it in great detail.'" "What Madoff told us was, 'If you invest with me, you must never tell anyone that you're invested with me. It's no one's business what goes on here,' says an investment manger who took over a pool of assets that included an investment in a Madoff fund. 'When he couldn't explain to my satisfaction how they were up or down in a particular month,' he added, 'I pulled the money out.'"

        e.      In fact, Madoff never allowed investment managers who placed their clients' assets with BMIS to look behind the curtain and scrutinize the investment management branch of his operations. Instead, investment managers, including defendants Jeanneret Associates and Ivy, had to take Madoff's representations regarding his investment strategies and returns at face value without any adequate verification consistent with their fiduciary duties of due diligence and prudence.

        f.      In essence, dealing with Madoff meant that a fund manager was required to willfully abrogate his or her fiduciary obligations to the fund's investors in exchange for the benefits of highly consistent returns and the lucrative management fees that flowed therefrom. The Jeanneret and Ivy Defendants were no different in their complacency and fell in line with Madoff's *modus operandi* which dated back to the inception of his practice as an investment manager. In his interview with the PBS program, *Frontline: The Madoff Affair* (hereinafter, "Frontline program" or "Frontline"), Michael Bienes, a money manager who funneled funds into Madoff's operation during its nascent stages, recounted the following:

        **Q:**    How did you check up on Bernie to make sure that everything was OK on his end?

We did not.

**Q:**     Why not?

I was gonna walk in and say, "Bernie, let me see your books"?
He'd show me the door. He was my income. He was my life.
How could I do such a thing?

\*          \*          \*

I never used [Madoff's] name. I never used his name. **To me, it
was like the secret name of God.** Even when we had the
business, I tried not to use his name.

\*          \*          \*

I never brought people to him. I brought people to me, not him.

\*          \*          \*

[Regarding bringing other funds to Madoff]: "Let me tell you
something. You want to do this? You don't go to Bernie. You
come to us." . . .

"Work through us." Yeah. "You work through us." Because
Bernie was the well. If you have a well that's supplying cool, clear
water, you don't want everybody to come and feed their cattle
there.

(Frontline Program, Michael Bienes (emphasis added).)

        g.     The pressure to remain under the radar was common to all fund managers

who dealt with Madoff. In her interview with Frontline, Sherry Shameer Cohen, a registered

sales assistant and secretary for the Fairfield Greenwich Group, fund managers of the Fairfield

Sentry Funds that were substantially exposed to Madoff, explained the paradoxical desire to

preserve secrecy and inconspicuousness:

I remember talking to Jeff [partner of the Fairfield Greenwich
Group] at that time I had started to transition into becoming a
writer, and I said to him: "You know, you're doing really great

stuff. Wouldn't it be great to, like, pitch stuff up to *Forbes* or *Fortune* or something like that?"

And he says: "No, no, no. I don't want too much attention being drawn to us. I don't want too many people calling." And that should have tipped me off, because most companies want more customers.

*    *    *

***Don't ask, don't tell:* *That seems to be their unofficial policy.*** As long as the money comes rolling in, why ask? Why jeopardize something?

(Frontline Program, Sherry Cohen) (emphasis added).

     h.     In her interview with Frontline, Sandra Manzke, CEO of Maxam Capital, another Madoff feeder-fund, corroborated the "don't ask, don't tell" policy that fund managers uniformly followed with respect to their Madoff accounts:

> **Q:**     Did Madoff say to you, "Don't put me on your prospectus"?
>
> Yes. He did. [. . .] That was one of, always, Bernie's conditions of getting an account.
>
> **Q:**     But you've publicly called for transparency. That's transparency.
>
> Yes. But many funds and investors were very secretive. They didn't mention that they had money with Madoff. It was something you didn't talk about.

(Frontline Program, Sandra Manzke.) Like the Fairfield fund managers and Ms. Manzke of Maxam Capital, the Jeanneret Defendants complied with Madoff's "don't ask, don't tell" policy and remained willfully blind to the myriad warning signs that Madoff was a fraud, in complete disregard of the duties they owed to Plaintiff and Class members.

     117.     The numerous warnings signs, included, but are not limited to, the following:

a.    <u>Suspect Strategy</u>: The description of Madoff's split-strike conversion strategy appeared to be inconsistent with the pattern of returns in the track record, which showed only seven small monthly losses over a 14-year period.  Moreover, the returns purportedly generated by this strategy could never be replicated by quantitative analysts who attempted to do so.  Harry Markopolos ("Markopolos"), a hedge fund consultant, stated that he was hired by a fund in 2006 to look into one of the feeder fund's returns and found that it was "statistically impossible to replicate them."  In May 1999, Markopolos sent a letter to the SEC describing how Madoff could not have generated the returns he reported using the split-strike conversion strategy.  As reported in the *MAR/Hedge* article: "The best known entity using a similar strategy, a publicly traded mutual fund dating from 1978 called Gateway, has experienced far greater volatility and lower returns during the same period."

b.    <u>Suspect Market-Timing & Trade Execution Prices</u>: Account statements revealed a pattern of purchases at or close to daily lows and sales at or close to daily highs, which is virtually impossible to achieve with the consistency reflected in Madoff's reported results.  Additionally, Madoff sent to his clients, paper confirmation tickets reflecting each trade he purportedly made, in addition to the monthly paper account statements, both of which disclosed the price at which each purchase or sale was supposedly made.  According to allegations by, *inter alia*, Irving Picard, trustee for the liquidation of BMIS, several monthly account statements and trade tickets reflected trades purchased or sold on behalf of clients' accounts in certain securities that were allegedly executed at prices outside the daily range of prices for such securities traded in the market on the days in question. (*See, e.g., Picard v. Merkin*, No. 08-01789 (BRL) at p. 16, (S.D.N.Y. Bankruptcy, May 6, 2009)).

c.    <u>Impossible Options Volumes</u>: Trading volumes reflected in accounts were vastly in excess of actually reported trading volumes. In particular, the S&P 100 Index options that Madoff purported to trade could not handle the reported trading volume. A report from *Bloomberg* estimated that Madoff's strategy would have required at least 10 times the S&P 100 Index option contracts that traded on U.S. exchanges. Testifying before the House Committee on Financial Services on February 4, 2009, Markopolos explained that *any* industry professional should have been able to determine that Madoff was a fraud based solely on the basis of analyzing options volumes:

| | |
|---|---|
| Markopolos: | A lot of the victims thought that they were getting a highly diversified portfolio. . . . [Madoff] was purporting to own 30 to 35 of the bluest chip stocks, the largest companies in America. And they'd see that on their statements. And they felt very comfortable owning those companies, and they considered it a very diversified basket, because it really was a diversified basket. |
| Rep. Ackerman: | But there was nothing they could do to check it out, that he didn't actually buy it. |
| Markopolos: | You could. As an individual investor you could not. ***But as a feeder fund, you should have been able to go to the New York Stock Exchange and see that those volumes of that stock did not trade that day at that price.*** They could have gone to the Option Price Reporting Authority that the Chicago Board Options Exchange offers. And you would have seen that no OEX index options traded at those prices that day. |

Testimony of Harry Markopolos before the House Committee on Financial Services, February 4, 2009 (hereinafter, "Markopolos Testimony") (emphasis added).

d.    No Standalone Hedge Fund: Madoff operated through managed accounts, rather than by setting up a hedge fund of his own, where his fees would have been much higher than the brokerage commissions he was charging. This is particularly suspicious because a hedge fund requires annual audits. Indeed, the *MAR/Hedge* article highlighted this fact as particularly suspect because BMIS was willing to earn commissions off the trades rather than "set up a separate asset management division to offer hedge funds directly to investors and keep all the incentive fees for itself . . ." In his November 7, 2005 submission to the SEC ("Markopolos SEC Submission"), Markopolos reiterated this peculiar arrangement:

> **MOST IMPORTANTLY**, why would [Madoff] settle for charging only undisclosed commissions when he could earn standard hedge fund fees of 1% management fee + 20% of the profits? Doing some simple math on [Madoff]'s 12% average annual return stream to investors, the hedge fund, before fees would have to be earning average annual returns of 16%. Subtract out the 1% management fee and investors are down to 15% [of profits]. 20% of the profits would amount to 3% so investors would be left with [...] 12% annual returns. . . . Total fees to the third party FOF's would amount to 4% annually. Now why would [Madoff] leave 4% in average annual fee revenue on the table unless he were a Ponzi Scheme?

(Markopolos SEC Submission, Nov. 5, 2005, at 3.). Fund managers and Investment Advisers, including the Ivy and Jeanneret Defendants, benefited from this arrangement because obtaining similar services from another hedge fund would have reduced the amount of fees received by Defendants.

e.    Cash Positions: BMIS liquidated its securities positions at the end of each quarter, presumably to avoid reporting large securities positions. Indeed, Irving Picard, the court-appointed trustee charged with sorting out what Madoff assets remain, reported that Madoff never (at least during the Class Period) engaged in any trades. Victims' quarter-end and year-end reports often reflected positions in only United States Treasury Bills. As Markopolos

explained to the House Committee on Financial Services, this practice was indicative of the

underlying fraud being perpetuated by Madoff and was cause for further investigation:

> Markopolos:   If you're not holding any financial instruments that
> are recordable at year-end marking period or quarter-end marking
> period, especially if you're in treasury bills, which are book entry
> form only – there's no physical securities there – there was nothing
> there for the auditors ever to inspect.

(Markopolos Testimony.)

       f.    <u>Lack of a Third Party Custodian and Administrator</u>: The Funds' assets

with BMIS were not held by a third party custodian but rather by Madoff himself.  Moreover,

BMIS initiated trades in the accounts, executed the trades, and served as custodian and

administrator for the accounts.  Thus, instead of using an outside prime broker as nearly all

hedge funds do, Madoff was his own prime broker and custodian of all the assets he managed.  A

December 13, 2008 article in *The Wall Street Journal* quoted Chris Addy, founder of Castle Hall

Alternatives, which anlayzes hedge funds for clients, as follows: "There was no independent

custodian involved who could prove the existence of assets . . . There's a clear and blatant

conflict of interest with a manager using a related-party broker-dealer.  Madoff is enormously

unusual in that this is not a structure I've seen."  In his interview with the Frontline program,

Frank Casey, a colleague of Markopolos, explained why relying on the trade confirmations and

account statements provided by BMIS was an exercise in futility and did not constitute due

diligence:

> Thierry [a French money manager] said: "Well I've been doing
> this due diligence on [Madoff] . . . I get reports every day of which
> positions are bought, which are sold, and which options are
> purchased and which are sold."  And he had, I remember, two or
> three clerks logging everything into a computer, all the
> confirmations that he was receiving from Madoff Securities . . .

> I said: "Why are you bothering logging in all these pieces of
> paper? He can make that up. There's no check and balance here.
> . . . I wouldn't even bother having two or three clerks log this thing
> in. *I would just have one guy, once a week, sit down, look over
> the trades at the end of the week and see if any of them were
> trading outside of the day's range.*"

(Frontline: The Madoff Affair, Interview Transcript of Frank Casey, available at PBS.org)

(emphasis added).

       g.    <u>Obscure and Ill-Equipped Auditor</u>:  BMIS was audited by Friehling &

Horowitz ("F&H"), which had three employees, of which one was 78-years old and living in

Florida, one was a secretary, and the other was an active 47-year old accountant, whose office in

Rockland County, NY, was 13 feet by 18 feet.  As Representative Sherman of California

remarked during the February 4 testimony of Markopolos before Congress, it was physically

impossible for a three person accounting firm staffed with one active CPA to properly audit a

$17 billion firm:

> Now it is physically impossible for one CPA to audit a $17 billion
> firm. But even if it was possible, you're supposed to be an
> independent auditor. Independence includes not getting more than,
> say, about a fifth of your revenue from any one client.  So unless
> you think that one CPA could audit a $17 billion operation and be
> done in a couple of months, you've got a fraudulent financial
> statement in your hand, not to mention your professional expertise
> focused on the fact that you cannot earn those kinds of
> continuously positive, even returns.

(Representative Sherman, Markopolos Testimony.)  Indeed, managers of feeder funds who dealt

with Madoff early on in his career as an investment adviser harbored reservations about the

apparent inadequacy of Madoff's chosen auditor.  In his interview with the Frontline Program,

Michael Bienes expressed his concern about Madoff's accountant, Jerry Horowitz of Friehling

Horowitz, P.C.:

Jerry was a nice guy, very quick, very good. [. . .] And guess what? He was Bernie's accountant. . . . Then I was saying to myself for a second: "What's with this old man? He can't be Bernie's accountant; he's not independent." But Jerry was Bernie's accountant, and Jerry was a one-man show . . .

**Q:** Wasn't that a red flag [that Madoff used such a small accounting firm]?

To me, I was always wondering about it, because . . . [a]uditing is a very labor-intensive business. That's why all the accounting firms wanted to get into consulting. It's just, auditing is so labor-intensive, they can't make a profit. And I was always wondering about Jerry doing this.

(Frontline Program Transcript, PBS.org.). On March 18, 2009, David G. Friehling ("Friehling") was arrested and criminally charged with securities fraud and with aiding and abetting Madoff's Ponzi scheme. The SEC also filed a civil complaint against Friehling and F&H, alleging that F&H never conducted even minimal audit procedures on Madoff and/or BMIS and failed to confirm that the securities BMIS purportedly held on behalf of its investors actually existed.

        h.    <u>Audit Reports</u>: Audit reports of BMIS showed no evidence of customer activity whatsoever, with neither accounts payable nor accounts receivable from customers. BMIS appeared to be nothing more than a market maker – not a firm with $17 billion in customer accounts.

        i.    <u>Family Run Operation</u>: Key positions at BMIS were controlled by Madoff family members (Madoff's brother, two sons, and niece). As noted by a due diligence team from Société Générale's investment bank, a European bank that internally blacklisted Madoff and prohibited the bank from doing business with him, the fact that Madoff's brother, Peter Madoff, was the chief compliance officer at BMIS was a significant red flag that informed their decision to avoid Madoff entirely. Nelson D. Schwartz, *European Banks Tally Losses Linked to Fraud*, New York Times, Dec. 17, 2003.

j.    <u>Lack of Electronic Access</u>: BMIS was supposedly technologically advanced but Funds did not have electronic access to their accounts at BMIS.  Paper documentation provided Madoff with the ability to manufacture trade tickets purporting to confirm investment results that had not and were not occurring, and to falsify supporting documentation.  This lack of technological sophistication in Madoff's reporting methods aroused the suspicion of Ms. Cohen at Fairfield Greenwich Group:

> So I looked at [the statements from Madoff], and I said, "Something is very strange."  Every bank statement, every brokerage house statement that I've ever seen, is usually on a very thick paper, and it's got a big logo emblazoned on it, and it's got lots and lots of small print on the front and on the back. . . .  None of that was on there.  It just looked as if it came off a typewriter or [a] dot matrix [printer]. . . . *I mean, it's so easy these days to perpetuate a fraud with something that looks more impressive, but here it looked so unprofessional. . . . And that's why I don't understand how could they not question any of these things.  It doesn't look like a normal statement.*

(Frontline Program, Sherry Cohen (emphasis added).)

## G.    Investment Professionals Who Did Conduct Due Diligence and Even Laymen Discovered the Red Flags Warning That Madoff Was Operating a Fraud

118.    Investment professionals who actually investigated the legitimacy of Madoff's operations uncovered the red flag warnings and, based on the numerous red flags and the absence of any legitimate explanation from Madoff as to how he could generate such consistent results, concluded that his operation must be a fraud.

119.    In his 2005 SEC Submission, Markopolos set forth in over 17 single-spaced pages and a two-page attachment, how Madoff's returns could not be real.  Markopolos identified 29 red flags that were signs of highly suspicious activity in BMIS.  Among those already discussed above and several others, he identified the following red flags:

     a.     "It is mathematically impossible for a strategy using index call options and index put options to have such a low correlation to the market where its returns are supposedly being generated from. This makes no sense! . . . However, BM's performance numbers show only 7 extremely small [monthly] losses during 14½ years and these numbers are too good to be true. The largest one month loss was only -55 basis points (-0.55%) or just over one-half of one percent! And BM never had more than a one month losing streak!"

     b.     "Madoff does not allow outside performance audits."

     c.     "Madoff's returns are not consistent with the one publicly traded option income fund with a history as long as Madoff's."

     d.     "Why is Bernie Madoff borrowing money at an average rate of 16.00% per annum and allowing these third party hedge fund, fund of funds to pocket their 1% and 20% fees bases [sic] upon Bernie Madoff's hard work and brains? Does this make any sense at all? Typically FOF's [funds of funds] charge only 1% and 10%, yet BM allows them the extra 10%."

120.    As summed up by Markopolos: "If I was the world's largest hedge fund and had great returns, I'd want all the publicity I could garner and would want to appear as the world's largest hedge fund in all of the industry rankings. Name one mutual fund company, Venture Capital firm, or LBO firm which doesn't brag about the size of their largest funds' assets under management. Then ask yourself, why would the world's largest hedge fund manager be so secretive that he didn't even want his investors to know that he was investing their money? Or is it that [Madoff] doesn't want the SEC and [the Financial Services Authority] to know that he exists?"

121.     In 2007, investment manager Aksia urged its clients not to invest in Madoff feeder funds after performing due diligence on Madoff and discovered several red flags, including:

a.     Madoff's comptroller was based in Bermuda, whereas most mainstream hedge funds have their own in-house comptrollers;

b.     Madoff's auditor, F&H, operated out of a 13 x 18 foot location in New City, New York, and included one partner in his late 70s who lives in Florida, a secretary, and one active accountant, whereas most hedge funds are audited by a Big Three accounting firm. F&H is now under investigation by the district attorney of Rockland County; and

c.     Aksia discovered the 2005 letter from Markopolos to the SEC described above.

122.     Aksia prepared its client advisory after, among other things, reviewing the stock holdings of BMIS that were reported in quarterly statements filed with the SEC.  Aksia concluded that the holdings appeared to be too small to support the size of the assets Madoff claimed to be managing.  The reason for this was revealed on December 15, 2008, when investigators working at Madoff's New York offices concluded that Madoff had been operating a secret, unregistered investment vehicle from his office.

123.     In addition to the foregoing, investment advisors and professionals, who thoroughly looked into Madoff's trading, were unable to reconcile investors' account statements with the reported returns.  In a December 13, 2008 article in *The New York Times*, Robert Rosenkranz, principal of hedge fund adviser Acorn Partners, was quoted as saying, "Our due diligence, which got into both account statements of [Madoff's] customers, and the audited statements of Madoff Securities, which he filed with the S.E.C., made it seem highly likely that

the account statements themselves were just pieces of paper that were generated in connection with some sort of fraudulent activity."

124.    Similar concerns informed Société Générale's due diligence team to internally blacklist Madoff and advise wealthy clients at its private banks against investing with him. Indeed, as Drago Indjic, a project manager at the Hedge Fund Center of the London Business School noted, many European hedge fund companies saw the tell-tale signs of a Ponzi scheme all along:

> Madoff did not pass due diligence for many European hedge fund companies ... Experienced people know there are many ways to provide the kind of return stream offered by Madoff, almost like a bank account, and one of them is Ponzi scheme.

(Nelson D. Schwartz, *European Banks Tally Losses Linked to Fraud*, New York Times, Dec. 17, 2008.).

125.    In July 2008, the managers of the Fort Worth Employees' Retirement Fund heeded the advice of Albourne Partners, a London due diligence firm, and liquidated its $10 million stake in the Rye Select Broad Market Fund, a fund that was entirely invested with Madoff. According to a December 31, 2008 article in BusinessWeek, Albourne Partners had "long-standing concerns about Madoff's trading strategy and consistent returns" and "had urged clients for nearly a decade to avoid affiliate funds such as Rye." Matthew Goldstein, *The Madoff Case Could Reel in Former Investors*, Dec. 31, 2008, BusinessWeek.

126.    Rogerscasey, a domestic registered investment adviser providing investment consulting services globally, issued several adverse ratings of Madoff-related feeder funds such as Fairfield Greenwich and Tremont dating as far back as 2002, "based largely on concerns about the integrity of the Madoff structure." A Rogerscasey newsletter published in December 2008 enumerates the several warnings it issued regarding Madoff:

- June 4, 2002 – We are exceedingly negative on Madoff as a hedge fund.

- November 21, 2002 – [Tremont's] largest exposure . . . is to Madoff . . . Where Tremont receives limited independent third-party transparency. . . . The only third-party, independent transparency that Madoff provides to its investors is being 100% in cash at the end of each year, so that its auditor can verify with Madoff's banker . . . that the cash is real. Madoff has no prime broker and no plan administrator. It acts as a broker/dealer, self-clears, and sends its own trade confirms to its investors all of whom have "cash" accounts.

- February 27, 2003 – [Fairfield Greewich] claims its due diligence is based on [employee name] at their firm checking the trade confirms that Madoff's broker dealer sends them. However, our point of view is that, since Madoff is self clearing, it could be making up its statements and tickets.

- February 26, 2004 – Although Tremont claims to receive access to Madoff's positions, the magnitude of the exposure and the truth of Tremont's transparency remain extremely disconcerting. . . . ***The Madoff exposure is a potential disaster. Even though some products would not be directly affected . . . Tremont's products will still see their reputations vaporized when Madoff rolls over like a big ship.***

Rogerscasey Flash, December 2008 at 1-2 (Emphasis added).

127.    The Rogerscasey Newsletter reiterates what Markopolos and several other industry professionals had expressed time and again regarding Madoff's investment strategy, that "Madoff's returns [. . .] were too good to be true." To reach this conclusion, Rogerscasey merely examined the returns of a mutual fund known to employ the so-called split-strike conversion strategy and found that, "there are months, and indeed some years, of negative performance." *Id.* at 2.

128.    Even those people with a less sophisticated or layman's understanding of the market and familiar with Madoff's investment advisory services harbored misgivings about the legitimacy of Madoff's operation.  For example, Sherry Cohen at Fairfield Greenwich Group explained why she thought better than to place her money with Madoff:

> **Q:**    Did you put your money in Fairfield Sentry?
>
> No, I didn't. . . . I didn't feel comfortable.  *Something didn't feel right.  I couldn't articulate it other than [that] my own returns in a similar portfolio were not as good as Madoff's.  I mean, look, I'm not a financial genius, but I'm not that stupid either* . . .

(Frontline Program, Sherry Cohen.) (Emphasis added).

129.    Similarly, the technical support staff at BMIS sensed that Madoff's operations on the 17th floor of the "Lipstick" building were suspect.  Nader Ibrahim, a member of the technical support staff at BMIS recounted:

> The feeling I got from a lot of the traders in casual conversation, it was more the [trading] strategies that he was using down there which nobody knew about. . . .That's what everybody in the firm was really trying to figure out: What was going in? [. . .] where were these trades being made? Some of the people did ask, if he's putting so much money into the market, why aren't they seeing any of these fluctuations in volume?
>
> **Q:**    . . . But you're saying those trades weren't showing up on the 19th floor [the market making wing of BMIS].
>
> Right. . . . If . . .the traders knew [what was] actually happening, they would have some kind of evidence; there would be something going on that would move the market.  . . . they weren't seeing that.

(Frontline Program, Nader Ibrahim.)

130.    Defendants willfully ignored what were apparent red flags to many other industry professionals as well as laymen.  By egregiously refusing to see the obvious warning signs and investigate the doubtful practices of Madoff, they abandoned their fundamental duty to perform

due diligence as fiduciaries to Plaintiff and Class members, but nevertheless collected their

substantial management and incentive fees. As discussed above, conducting "due diligence"

solely based on the information Madoff provided to feeder fund managers could not, in any sense

of the term, constitute "due diligence" given the anomalous structure of Madoff's operation.

Rogerscasey described the importance of maintaining a high standard of due diligence as

follows:

> One key factor for effectiveness in this area is the operational due
> diligence resources in place at a hedge fund of funds with
> dedicated, experienced staff that can review the back office and
> operations of their underlying hedge funds. We consider it best
> practice in this area that the head of operational due diligence at a
> hedge fund of funds should have a reasonable level of seniority
> within the organization and should be in a position to veto
> investment with any hedge fund where there are operational
> concerns.

(Rogerscasey Newsletter, at 2-3.)

131.    Madoff's anomalous operational structure warranted a heightened level of due

diligence. As noted above, Madoff was his own prime broker and custodian of all the assets he

managed. Chris Addy told *The Wall Street Journal* on December 13, 2008 that such conduct

was unusual because without an independent custodian, there was no one "involved who could

prove the existence of assets." According to Addy, "There's a clear and blatant conflict of

interest with a manager using a related-party broker-dealer."

132.    According to Rogerscasey, operational concerns that should prevent an

investment from taking place are:

> •       An independent custodian. Madoff appears to have had
> custody of the assets within his firm, making it impossible
> to confirm investors' balances independently.

> •       An independent administrator to value the portfolio
> independently and strike monthly net asset values.

- An independent auditor with the expertise to audit potentially complex investment strategies.

*Id.* The Jeanneret Defendants and the Ivy Defendants held such positions of seniority that empowered, and indeed, obligated them to veto investments which raised serious concerns in terms of integrity. In dereliction of their duties, the Jeanneret Defendants and Ivy Defendants ignored what their peers in the industry, after performing the most basic due diligence, found to be unacceptable signs of impropriety. Instead of pulling the Fund and other Class members out of Madoff, the Jeanneret Defendants and Ivy Defendants committed millions of dollars of their clients' assets to his fraudulent scheme while collecting substantial fees. The Jeanneret Defendants and Ivy Defendants placed their blind faith in Madoff's strategy solely based on his reputation for consistent returns rather than on the sound and prudent evaluation that is required of a fiduciary, and the heightened level of prudence required of an ERISA fiduciary.

133. Defendants were presented with a litany of anomalous facts and practices of Madoff and BMIS that made Madoff's representations obviously false, if not dubious to a degree warranting further inquiry. Had Defendants conducted due diligence or, if conducted, a proper one, into Madoff, BMIS, and/or Madoff-controlled entities, they would have discovered at least some of the dozens of red flags identified herein. At the very least, like Aksia, Defendants should have been able to discover the existence of Markopolos' letter, which would put them on notice the 29 red flags identified therein.

134. Instead, Defendants relied on the reputation of Madoff without conducting any reasonable investigation of the bona fides of Madoff and his operations, and/or any real analysis of the trading strategies and investment returns reported by Madoff, which remained consistently high over years, even during adverse market conditions.

135.    Defendants acted with reckless disregard for the truth, or at the least, gross negligence and violated their duties by failing to perform, or cause to be performed, appropriate due diligence that would have revealed that assets of the Fund were invested in a Ponzi scheme being perpetuated by Madoff through BMIS and other Madoff-controlled entities and by failing to monitor the Fund's investments in these Madoff entities.

## CLAIMS FOR RELIEF

### COUNT I
### Violation of Section 10(b) of the Exchange Act and Rule 10b-5 of the Securities and Exchange Commission (Against Jeanneret Associates, Dr. Jeanneret, Perry, and Ivy Asset Management)

136.    Plaintiff, the Fund, repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

137.    This Count is brought by Plaintiff, the Fund, against Jeanneret Associates, Dr. Jeanneret, Perry, and Ivy Asset Management, for violations of Section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder.

138.    During the Class Period, Defendants: (i) carried out a scheme, plan and course of conduct, in connection with the purchase and sale of securities, that was intended to and, through the Class Period, did deceive the investing public, including Plaintiff and other Class members; (ii) made various deceptive and untrue statements of material fact as set forth in ¶¶ 80-84, 86, and 91 necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading to Plaintiff and other Class members; and (iii) engaged in acts, practices, or a course of business which operated as a fraud or deceit upon Plaintiff and Class members.  In particular, the Ivy Defendants orchestrated the scheme by (i) serving as the primary conduit through which Jeanneret placed Plaintiff's and other Class members' assets with Madoff, and (ii) directing the misstatements and omissions contained in Jeanneret Associates'

reports to Plaintiff and other Class members. The purpose and effect of such conduct was, among other things, to induce Plaintiff and the other members of the Class to retain BMIS and Madoff's fraudulent investment services.

139.    During the Class Period, Defendants, pursuant to said scheme, plan, and unlawful course of conduct, knowingly or recklessly issued, caused to be issued, participated in the issuance of, the preparation and issuance of deceptive and materially false and misleading statements to Plaintiff and other Class members.

140.    In ignorance of the false and misleading nature of the acts described herein and the deceptive and manipulative devices and contrivances employed by said Defendants, Plaintiff and the other members of the Class reasonably relied, to their detriment, on such misleading statements and omissions in making investments with BMIS and Madoff. Plaintiffs and the other members of the Class have suffered substantial damages as a result of the wrongs alleged herein in an amount to be proved at trial.

141.    During the Class Period, Defendants, pursuant to said scheme, knowingly and recklessly employed the following deceptive devices and contrivances:

        a.    Materially false and misleading informational circulars in response to request for proposals designed to market and promote Madoff's services;

        b.    Discretionary Investment Management Agreements containing materially false and misleading statements concerning investment strategies and the level of supervision to be exercised over outside Investment Managers; and

        c.    Financial statements that created a false impression of the portfolios under Madoff's management that enabled Madoff to perpetuate his scheme and victimize the Plaintiff and Class Members.

142.    By reason of the foregoing, Defendants directly violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.  As a direct and proximate result of their wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their investments with Madoff and BMIS.

## COUNT II
### Violation of Section 20(a) of the Exchange Act
### (Against Jeanneret and Perry)

143.    Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

144.    Jeanneret and Perry acted as controlling persons of Jeanneret Associates within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high level positions, participation in and/or awareness of Jeanneret Associates' operations, and/or intimate knowledge of Jeanneret Associates' products, sales, accounting, plans and implementation thereof, they had the power to influence and control and did influence and control, directly or indirectly, the decision-making of Jeanneret Associates, including the content and dissemination of the various statements that Plaintiffs allege herein as false and misleading.

145.    Jeanneret and Perry had direct and supervisory involvement in the day-to-day operations of Jeanneret Associates and, therefore, are presumed to have had the power to control or influence the particular allegedly false and misleading statements giving rise to the securities violations alleged herein.

146.    Jeanneret and Perry oversaw the Discretionary Investment Management Agreements that Plaintiff and other Class members executed with Jeanneret Associates, within which there were repeated misrepresentations of Jeanneret Associates' investment strategy to investors.  Pursuant to the Discretionary Investment Management Agreements between Jeanneret Associates and various members of the Class, Jeanneret Associates agreed to supervise and

direct the investment of the assets of the union pension funds. However, Jeanneret and Perry

knew or should have known that, because the union pension funds' monies would be invested

with Madoff, they could not be supervised and directed to the degree purported in the investment

management agreements.

147.    Jeanneret and Perry ignored their contractual, statutory, and common law duties

while engaging in a scheme to defraud investors, and engaged in a culpable course of conduct

that operated as a fraud on investors and employed devices such as the Discretionary Investment

Management Agreements to defraud investors.

148.    Jeanneret and Perry were consciously involved in the actions of Jeanneret

Associates, and were thus culpable participants in the actions perpetrated by Jeanneret

Associates.

149.    By virtue of their positions as controlling persons, as well as their culpable

participation in the actions carried out by Jeanneret Associates, Jeanneret and Perry are liable

pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of their wrongful

conduct, Plaintiffs and the other members of the Class suffered damages in connection with their

investments with Madoff and BMIS.

## COUNT III
### Violation of Section 20(a) of the Exchange Act
### (Against Individual Ivy Defendants and BONY)

150.    Plaintiff repeats and realleges each and every allegation contained in the

foregoing paragraphs as if fully set forth herein.

151.    The Individual Ivy Defendants acted as controlling persons of the Ivy Asset

Management within the meaning of Section 20(a) of the Exchange Act as alleged herein. By

virtue of their high level positions, participation in and/or awareness of Ivy's operations, and/or

intimate knowledge of Ivy's contractual agreement with Jeanneret Associates, and the services provided thereunder, they had the power to influence and control and did influence and control, directly or indirectly, the decision-making of Ivy Asset Management, and thus, by virtue of such control over Ivy Asset Management, influence and control over the representations made by Defendant Lawrence Simon and Jeanneret Associates, including the content and dissemination of the various statements that Plaintiffs allege herein as false and misleading. The Individual Ivy Defendants had the ability to prevent the issuance of the allegedly false and misleading statements or cause the statements to be corrected.

152.    The Individual Ivy Defendants had direct and supervisory involvement in the day-to-day operations of Ivy Asset Management and, therefore, are presumed to have had the power to control or influence the particular allegedly false and misleading statements made by Ivy Asset Management and Jeanneret Defendants, which have given rise to the securities violations alleged herein.

153.    BONY Defendants, by virtue of their acquisition of Ivy Asset Management in 2000, which was mainly due to Ivy's Taft-Hartley Pension Plan clientele, had the power to influence and control, and did influence and control the decision making of Ivy Asset Management. This includes BONY's recommendations to Ivy Asset Management that caused it to divest its own assets under Madoff's management while allowing it to continue, in its capacity as an investment consultant, advising its clients (*i.e.*, Jeanneret Associates), to blindly entrust Plaintiffs' and Class members' assets with Madoff.

154.    By virtue of their positions as controlling persons or entities, the Individual Ivy Defendants and BONY Defendants are liable pursuant to Section 20(a) of the Exchange Act. As

a direct and proximate result of their wrongful conduct, Plaintiffs and the other members of the

Class suffered damages in connection with investments with Madoff and BMIS.

**COUNT IV**
**Breach of Fiduciary Duty of Under ERISA**
**(Against Jeanneret and Ivy Defendants)**

155.    Plaintiffs repeat and reallege each and every allegation contained in the foregoing

paragraphs as if fully set forth herein.

156.    ERISA requires that a fiduciary to an employee benefit plan act "with the care,

skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting

in a like capacity and familiar with such matters would use in the conduct of an enterprise of a

like character and with like aims." 29 U.S.C. § 1104(a)(1)(B).

157.    By virtue of their authority over the assets of the Fund and of other ERISA Class

members' benefit plans, as well as oversight and administrative services provided to such ERISA

covered plans, and/or investment advice provided for a fee by Jeanneret Associates to the union

pension plans the Jeanneret Defendants have at all relevant times been fiduciaries with respect to

the ERISA Class, and have at all relevant times had a responsibility to manage such assets in

accordance with the provisions of ERISA.

158.    By virtue of the investment advice provided to Jeanneret for a fee, and its *de facto*

control over the investment advice dispensed by Jeanneret Associates vis-à-vis Madoff, Ivy and

the Individual Ivy Defendants have at all relevant times been fiduciaries with respect to the

ERISA Class, and have at all relevant times had a responsibility to manage such assets in

accordance with the provisions of ERISA.

159.    Accordingly, the Ivy and Jeanneret Defendants owed a duty of prudence and

loyalty to ERISA Class members under ERISA, in that they were required to act solely in the

interest of the employee benefit plan participants and beneficiaries whose plan assets they

managed or with respect to which they advised for a fee, and as part of such fiduciary duties, Defendants owed a duty to prudently manage and invest the assets of these plans. The Jeanneret and Ivy Defendants breached that duty by, *inter alia*:

a.     Failing to sufficiently investigate the investments controlled by Madoff or BMIS to insure that they were a safe, prudent, honest and suitable investment for union pension benefit plans and their participants and beneficiaries;

b.     Failing to identify warning signs and available information about the unreliability and suspicious nature of accounts managed or controlled by Madoff or BMIS;

c.     Failing to act on warning signs and available information about the unreliability and suspicious nature of accounts managed or controlled by Madoff or BMIS by:

i.     Entrusting the assets of the union pension fund clients to BMIS, or advising that they be so entrusted; and

ii.     Failing to withdraw the assets of the union pension funds from BMIS or failing to advise that they be so removed.

d.     Misrepresenting and/or failing to disclose the true facts concerning their Plan's investment and BMIS and defendant's due diligence relating thereto.

160.     As a result of the above-described conduct, the Jeanneret and Ivy Defendants have acted in violation of ERISA, 29 U.S.C. § 1104(a)(1)(B). As such, these Defendants are liable to restore any losses to the employee benefit plans covered by ERISA that invested and remained invested in the Fund and as a result suffered losses through the investment by these Defendants of the Fund's assets in accounts managed or controlled by Madoff or BMIS.

## COUNT V
### Breach of Fiduciary Duty – Failure to Comply with Documents and Instruments Governing the Plan by Entrusting Assets to Madoff or Madoff Securities
#### (Against the Jeanneret and Ivy Defendants)

161.    Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein

162.    ERISA requires that a fiduciary with respect to an employee benefit plan act "in accordance with the documents and instruments governing the plan." 29 U.S.C. § 1104(a)(1)(D).

163.    The Jeanneret Defendants executed Discretionary Investment Management Agreements with Plaintiff and other Class members, within which they repeatedly misrepresented Jeanneret Associates' investment strategy to investors. Pursuant to discretionary investment management agreements between Jeanneret Associates and Plaintiffs, Jeanneret Associates agreed to supervise and direct the investment of the assets of Plaintiffs and other Class members. However, Jeanneret and Perry knew or should have known that, because Plaintiff's and other ERISA Class members' assets would be invested with Madoff, their investments could not be supervised and directed to the extent reflected in the investment management agreements.

164.    By virtue of the investment advice provided to Jeanneret for a fee, and its *de facto* control over the investment advice dispensed by Jeanneret Associates vis-à-vis Madoff, Ivy and the Individual Ivy Defendants have at all relevant times been fiduciaries with respect to the ERISA Class. As such, Ivy also had a duty to exercise the prudence required of an ERISA fiduciary. Ivy knew or should have known that because Plaintiffs' and other ERISA Class members' assets would be invested with Madoff, their investments could not be supervised and directed to the extent reflected in the investment management agreements.

165.    Had the Jeanneret Defendants and Ivy Defendants conducted themselves in accordance with the governing Investment Management Agreements, Madoff would not have

been in a position to misappropriate the assets of Plaintiffs' and other ERISA Class members' employee benefit plans during the Class Period.

166.    As such, the Jeanneret and Ivy Defendants are liable to restore any losses to the employee benefit plans covered by ERISA that invested in BMIS and as a result suffered losses through the Jeanneret Defendants' culpable conduct in violation of the documents and instruments governing the plan insofar as they were blindly entrusted with Madoff.

**COUNT VI**
**Breach of Fiduciary Duty – Failure to Comply with Documents and Instruments Governing the Plan, Breach of the Duty of Loyalty, and violation of 29 U.S.C. § 1106(a)(1)(D) Prohibiting Transfer to or Use By or For the Benefit of a Party in Interest of Plan Assets (Against Ivy and Jeanneret Defendants)**

167.    Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

168.    ERISA requires that a fiduciary to an employee benefit plan act "(A) for the exclusive purpose of: (i) providing benefits to participants and beneficiaries; and (ii) defraying the reasonable expenses of administering the plan." 29 U.S.C. § 1104(a)(1)(A).

169.    ERISA requires that a fiduciary with respect to an employee benefit plan act "in accordance with the documents and instruments governing the plan." 29 U.S.C. § 1104(a).

170.    ERISA prohibits a fiduciary with respect to an employee benefit plan from directly or indirectly causing the "transfer to, or use by or for the benefit of, a party in interest, of any assets of the plan." The Ivy and Jeanneret Defendants are each "parties in interest" as that term is used in ERISA, which include fiduciaries and service providers to any employee benefit plan in the definition of party in interest. 29 U.S.C. § 1106(a)(1)(D).

171.    The Ivy and Jeanneret Defendants caused or allowed the Fund, which held ERISA covered employee benefit plan assets and were therefore subject to ERISA, to transfer to BMIS,

Madoff, Jeanneret Defendants and Ivy Defendants, millions of dollars in investment management fees and undisclosed, shared fees based on ERISA covered employee benefit plan assets under management entrusted to Madoff or Madoff Securities, when these assets had in fact been misappropriated by Madoff as part of the Ponzi scheme he operated. Under the terms of the Discretionary Investment Management Agreement pursuant to which Plaintiffs and other Class Members' employee benefit plans invested, Jeanneret Defendants received a monthly fee amounting to almost 1% of assets under management annually, half of which, was shared by agreement with Defendant Ivy. This fee has been paid to the Jeanneret Defendants and a portion of it already shared with Defendant Ivy. No portion of this fee, however, has been refunded, even though the amount of the fee was calculated based on, in large part, misappropriated or entirely fictional assets and profits falsely claimed by Madoff or entities controlled by him to be held for investment on behalf of the Fund.

172. By causing or allowing this fee to be paid and subsequently retained without adjustment, based on purely fictional assets or assets which had been misappropriated, the Ivy and Jeanneret Defendants have violated 29 U.S.C. § 1106(a)(1)(D), insofar as the documents and instruments governing entitlement to fees calls for fees to be paid on assets actually managed on behalf of the Fund. Further, 29 U.S.C. § 1106(a)(1)(D) prohibits direct or indirect transfers of plan assets to parties in interest, and transfers can only be exempt if paid pursuant to a contract or reasonable arrangement for no more than reasonable consideration. Because the transfer at issue here was either in violation of the contract that provided for its payment, not paid pursuant to a reasonable arrangement, or if in compliance with a contract, amounted to more than reasonable compensation having been paid on misappropriated or fictional assets and profits, the transfer violated 29 U.S.C. § 1106(a)(1)(D).

173.    Accordingly, these Defendants are liable to restore any losses to the employee

benefit plans covered by ERISA that invested in BMIS or Madoff, and as a result, suffered losses

through the payment and retention of investment management fees and profit allocations based

on assets that had been misappropriated by Madoff or entities associated with him, or based on

assets which were entirely fictional.

**COUNT VII**
**Common Law Fraud**
**(Against the Jeanneret Defendants)**

174.    Plaintiffs repeat and reallege each and every allegation contained in the foregoing

paragraphs as if fully set forth herein.

175.    Plaintiffs and other members of the Class, in reasonable and justifiable reliance

upon the statements and representations made by the Jeanneret Defendants, as previously set

forth herein, entrusted their assets with BMIS and Madoff.  Plaintiffs and other members of the

Class would not have done so except for their reliance upon the representations made by the

Jeanneret Defendants in investment management agreements and information circulars (as set

forth in ¶¶ 80-84, and 91), and would not have invested with Madoff had they been aware of the

material omissions and concealment by the Jeanneret Defendants or the fact that Jeanneret

Associates, the Fund's Investment Manager, had abdicated its duty of oversight and entrusted a

majority of the Fund's assets to Madoff-related entities.

176.    At the time the statements and representations were made by the Jeanneret

Defendants, the Jeanneret Defendants knew or should have known them to be false and intended

to deceive Plaintiffs and other members of the Class by making such statements and

representations.

177.    Had Plaintiffs and other members of the Class known of the material facts that the Jeanneret Defendants wrongfully concealed and misrepresented, and the falsity of Jeanneret Defendants' representations, Plaintiffs and other Class members would not have invested and/or remained invested with BMIS and Madoff.

178.    Plaintiffs and other members of the Class, as a result of their investments with BMIS and Madoff and by reason of the Jeanneret Defendants' misrepresentations, have sustained, damages, suffered mental and emotional distress, and have lost a substantial part of their respective investments in an amount yet to be determined, and to be proven at trial.

179.    By reason of the foregoing, the Jeanneret Defendants are jointly and severally liable to Plaintiffs and other Class members.

180.    The Jeanneret Defendants' fraudulent acts were willful and wanton, and Plaintiffs and other Class members are entitled to punitive damages.

### COUNT VIII
### Aiding and Abetting Common Law Fraud
### (Against Ivy and Individual Ivy Defendants)

181.    Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

182.    As Jeanneret Associates' investment consultant, Ivy Asset Management had actual knowledge of the misrepresenations Jeanneret Associates was disseminating to Plaintiffs and other Class members.  With that knowledge, Ivy Asset Management knew of the fraudulent course of conduct being pursued by the Jeanneret Defendants, or was willfully blind to substantial evidence of such fraudulent conduct.

183.    Ivy Asset Management substantially assisted the fraud perpetrated by the Jeanneret Defendants by (i) failing to disclose the inadequate level of due diligence being

performed on Madoff and BMIS while Jeanneret continued to represent to Plaintiffs that it was living up to its duties of oversight and monitoring; and (ii) providing account reconciliation and bookkeeping services to Jeanneret and its clients, upon which Jeanneret relied to create the appearance of due diligence while knowing that the data provided by BMIS was inherently unreliable and cause for further inquiry.

184.    Plaintiffs and the Class have suffered damages proximately caused by Ivy Asset Management's aiding and abetting of the Jeanneret Defendants' fraudulent conduct, in an amount to be proven at trial.

## COUNT IX
### Breach of Fiduciary Duty
### (Against the Jeanneret Defendants)

185.    Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

186.    Jeanneret Defendants, as Investment Manager to the union pension funds, owed and continue to owe Plaintiffs and the Jeanneret Class fiduciary duties.

187.    As a result of the Jeanneret Defendants' abrogation of their duties to supervise and direct the union pension funds' investments in any reasonable fashion by investing in the monies with Madoff, the Jeanneret Defendants violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, oversight, good faith, and supervision owed to Plaintiffs and the Class. They acted in bad faith, with gross negligence and with reckless disregard of their obligation to use due care, and employ reasonable and prudent investment standards.

188.    As a proximate result of the Jeanneret Defendants' breaches of their fiduciary duties, Plaintiff and other Class members have sustained damages, suffered mental and

emotional distress, and lost a substantial part of their respective investments in an amount yet to be determined, and to be proven at trial.

189.    By reason of the foregoing, the Jeanneret Defendants are jointly and severally liable to Plaintiffs and other Class members.

190.    The Jeanneret Defendants' breaches were willful and undertaken in bad faith. Accordingly, Plaintiffs and other Class members are entitled to punitive damages.

**COUNT X**
**Breach of Contract**
**(Against the Jeanneret Defendants)**

191.    Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

192.    Plaintiffs and other Class members, were parties to Discretionary Investment Management Agreements with Jeanneret Associates.

193.    Under those documents and others incorporated therein, Jeanneret Defendants were required to perform duties and conditions in accordance with representations made in those documents, including selecting proper investment managers or advisers to whom to delegate the Fund's investment authority, performing adequate due diligence of the investment managers with whom they entrusted the Fund's assets, monitoring performance of the Fund's investments, and supervising and directing investments made with Madoff and BMIS.

194.    The Jeanneret Defendants breached their contracts with Plaintiffs and other Class members by failing to perform those and other duties owed under those documents, as set forth in the Discretionary Investment Management Agreements executed with Plaintiffs and other Class members.

195.    As a proximate result of Jeanneret Associates, Dr. Jeanneret, and Perry's breaches

of contract, Plaintiffs and other Class members have sustained damages and have lost their

respective investments in BMIS and Madoff, in an amount yet to be determined and to be proven

at trial.

## COUNT XI
### Negligent Misrepresentation
### (Against the Jeanneret Defendants)

196.    Plaintiffs repeat and reallege each and every allegation contained in the foregoing

paragraphs as if fully set forth herein.

197.    The Jeanneret Defendants owed to Plaintiffs and other Class members a duty

(a) to act with reasonable care in preparing and disseminating the Discretionary Investment

Management Agreements and other representations relied upon by Plaintiffs and other Class

members in deciding to make investments with Jeanneret Associates, and (b) to use reasonable

diligence in determining the accuracy of, and in preparing the information contained in,

Jeanneret's marketing and informational materials and Fund's financial statements.

198.    The Jeanneret Defendants failed to investigate, confirm, prepare and review with

reasonable care the information contained in the Discretionary Investment Management

Agreements, as well as other representations, including the periodic financial statements

disseminated to Plaintiffs and Class members.

199.    The Discretionary Investment Management Agreements never disclosed that full

and total control would be abdicated to the BMIS and Madoff.  In fact, such Agreements stated

quite the opposite, with representations being made that Jeanneret Defendants would be able to

fully supervise the assets invested with Madoff.

200.    Defendants breached the duty to use reasonable care by failing to disclose the material facts that Defendants were *not*:

  a.  Performing due diligence in connection with Plaintiffs' investments;

  b.  Monitoring and overseeing Plaintiffs' investments;

  c.  Safeguarding those investments from excessive risks of loss; and/or

201.    Defendants knew that investors would rely on the account statements provided by Jeanneret in selecting between investment management firms.

202.    Plaintiffs reasonably, justifiably, and materially relied upon the expectation that Defendants would vet, monitor, oversee, safeguard, and audit Plaintiff's investments.

203.    Plaintiffs would not have entrusted their capital to Defendants had Plaintiffs known that Defendants were not conducting due diligence, were not monitoring and overseeing Plaintiffs' investments and were not safeguarding those investments.

204.    As a direct, proximate, and foreseeable result of Defendants' negligence, Plaintiffs lost their capital and thereby suffered damages in an amount to be proven at trial.

## COUNT XII
### Gross Negligence and Mismanagement
### (Against the Jeanneret Defendants)

205.    Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

206.    The Jeanneret Defendants were retained by the members of the Jeanneret Class to invest their money in a manner consistent with the agreed upon investment guidelines and terms of Jeanneret's Discretionary Investment Management Agreement and ERISA.

207.    The Jeanneret Defendants owed fiduciary duties to Plaintiffs and the Class to conduct, manage, and supervise their investments in good faith and with due care. As set forth above, the Jeanneret Defendants breached their fiduciary duties to Plaintiff and the Class by

acting in bad faith and failing to exercise due care in the performance of their duties as fiduciaries.

208.    The Jeanneret Defendants should have prevented, through the exercise of reasonable diligence, the improper investing of a majority of the Fund's assets solely into BMIS and Madoff.

209.    The Jeanneret Defendants authorized, approved, participated in, failed to disclose, and improperly concealed the improper conduct described herein.

210.    Plaintiffs and the Class relied to their detriment on the Jeanneret Defendants to discharge their duties as fiduciaries in a careful and prudent manner.

211.    As a direct and proximate result of the gross negligence and misconduct of the Jeanneret Defendants, Plaintiffs and the Class have been harmed. These Defendants are liable to Plaintiffs and the Class in an amount to be determined at trial.

212.    The Jeanneret Defendants' gross negligence and mismanagement of plan assets was in bad faith and accordingly, Plaintiffs and other Class members are entitled to punitive damages.

## COUNT XIII
### Unjust Enrichment
### (Against the Ivy, Jeanneret Defendants and BONY)

213.    Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

214.    As a result of the misconduct detailed herein, Plaintiffs' and the other Class members' investments have been decimated; yet the Ivy Defendants, Jeanneret Defendants, and BONY have reaped substantial fees, dividends, and other pecuniary benefits at the expense of Plaintiffs and the Class.

215.    The Ivy Defendants, Jeanneret Defendants, and BONY have therefore been unjustly enriched, and equity and good conscience require that these Defendants disgorge to Plaintiffs and the Class all such unjust enrichment in an amount to be determined at trial.  As a proximate result of these Defendants' bad-faith breaches of their fiduciary duties, Plaintiffs and other Class members have sustained damages and lost a substantial part of their respective investments in an amount yet to be determined, and to be proven at trial.

**COUNT XIV**
**Aiding and Abetting Breaches of Fiduciary Duty**
**(Against Ivy Defendants)**

216.    Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

217.    As Jeanneret Associates' investment consultant, Ivy Asset Management had actual knowledge of the investments Jeanneret Associates was making on behalf of the Fund. With that knowledge, Ivy Asset Management knew of the fiduciary duty breaches by the Jeanneret Defendants, or was willfully blind to substantial evidence of such breaches.

218.    Ivy Asset Management substantially assisted the fiduciary duty breaches of the Jeanneret Defendants by (i) recommending, and continuing to recommend, BMIS as an outside investment manager for the Fund while knowing that neither itself, nor Jeanneret, could live up to the duties they owed to the Fund as investment managers of ERISA covered employee benefit plans, and (ii) providing account reconciliation and bookkeeping services to Jeanneret and its clients that created the appearance of due diligence while knowing that the data provided by BMIS was inherently unreliable and cause for further inquiry.

219.    Plaintiffs and the Class have suffered damages proximately caused by Ivy Asset

Management's aiding and abetting of the breach of fiduciary duties by the Jeanneret Defendants,

in an amount to be proven at trial.

## COUNT XV
### For Rescission Under the Investment Advisers Act
### (Against the Ivy and Jeanneret Defendants)

220.    Plaintiff, the Fund, repeats and realleges each and every allegation contained in

the foregoing paragraphs as if fully set forth herein.

221.    Jeanneret and Ivy acted as "Investment Advisers" to Plaintiff and other members

of the Class pursuant to the Investment Advisers Act.

222.    By executing Discretionary Investment Management Agreements, Jeanneret

executed "investment advisory contracts" under the Investment Advisers Act.

223.    Jeanneret executed a contract with Plaintiff and other members of the Class. This

contract designated Jeanneret as Investment Manager to Plaintiff and other members of the

Class.

224.    Ivy executed a contract with Jeanneret Associates in which Ivy functions as an

investment consultant to Jeanneret Associates.

225.    Jeanneret and Ivy violated section 206 of the Investment Advisers Act, 15 U.S.C.

§ 80b-6(2). Specifically, Jeanneret and Ivy, through the use of mails or interstate commerce,

engaged in transactions, practices, or courses of business which operated as a fraud or deceit

upon Plaintiffs and the Class.

226.    Jeanneret and Ivy failed to disclose that, they were unable to conduct meaningful

oversight into Madoff and BMIS, which would serve the roles of fund advisor, broker/dealer,

and custodian.  Such information was material and the Fund and other members of the Class

would not have invested in Madoff and BMIS had Jeanneret and Ivy made it known to them.

227.    Ivy was unjustly enriched by the investment management fees that it shared with Jeanneret in exchange for Ivy introducing Madoff to Jeanneret's clients, i.e. Plaintiff and Class members.

228.    The Jeanneret and Ivy Defendants knowingly misrepresented that they had conducted adequate due diligence on Madoff and on the controls in place within his firm to ensure that having Madoff and BMIS fulfill multiple roles would not put the assets of the Fund at risk.

229.    The Jeanneret and Ivy Defendants knowingly misrepresented the extent of ongoing monitoring they claimed to be providing to the Plaintiffs and other Class members.

230.    Plaintiff and other Class members have been damaged as a result of Jeanneret and Ivy's respective breach of their duties under the Investment Advisers Act.

231.    As a result, Plaintiff and the other Class members are entitled to rescission of their investment adviser contracts with Jeanneret and to recover, from Jeanneret and Ivy, all fees and commissions paid in connection to Plaintiff's and other Class members' investments in BMIS and Madoff.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

A.    determining that this action may be maintained as a class action, designating Plaintiff as Lead Plaintiff, and certifying Plaintiff as Class Representative under Rule 23 of the Federal Rules of Civil Procedure and appointing Plaintiff's counsel, Lowey Dannenberg Cohen & Hart, P.C., as Lead Counsel;

B.    determining that Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 of the Securities and Exchange Commission, Section 20(a) of the Exchange Act, Sections

1104 and 1105 of the Employee Retirement Income Security Act, Section 80b-6(2) of the

Investment Adviser's Act, and New York common law;

      C.     awarding compensatory damages in favor of Plaintiff and the Class against all

Defendants, jointly and severally, for all damages sustained as a result of Defendants'

wrongdoing, in an amount to be proven at trial, including both pre-judgment and post-judgment

interest thereon, to the extent allowed by law;

      D.     awarding punitive damages in favor of Plaintiff and the other Class members for

Defendants' wrongful conduct, in an amount to be determined at trial;

      E.     awarding additional damages in favor of Plaintiff and the Class consisting of all

management fees, incentive fees, commissions and referral fees received by the Defendants, or

any of them, from Madoff and/or BMIS during the Class Period;

      F.     alternatively rescinding the Discretionary Investment Management Agreements;

      G.     awarding Plaintiff and the Class prejudgment interest on all damages recovered,

to the extend allowed by law;

      H.     awarding Plaintiff and the Class their reasonable costs and expenses incurred in

this action, including counsel fees and expert fees; and

      I.     granting Plaintiff and the Class such other and further relief as the Court may

deem just and proper.

### **JURY TRIAL DEMANDED**

Pursuant to Fed. R. Civ. P. 38(a), Plaintiffs hereby demand a trial by jury of all issues so triable.

Dated: August 31, 2009

          LOWEY DANNENBERG COHEN & HART, P.C.

By: _____

Barbara Hart (BH-3231)
Thomas M. Skelton (TS-7908)
One North Broadway
White Plains Plaza, 5th Floor
White Plains, New York 10601
914-997-0500

*Attorneys for Plaintiff Plumbers & Steamfitters Local 267 Pension Fund and Gregory Lancette, Bradley Ward, Bryan Allen, David Waby, Donald A. Little, Jr., James Fredenburg, Peter Lauze, Frank Bisesi, Donald Beckley, Patrick Bonnell, Dominic Mancini, and James Rood as Trustees of the Plumbers & Steamfitters Local 267 Pension Fund*

## CERTIFICATION OF TRUSTEE OF
## PLUMBERS & STEAMFITTERS LOCAL 267 PENSION FUND

I, Greg Lancette, Trustee of the Plumbers & Steamfitters Local 267 Pension Fund, make this Certification pursuant to 28 U.S.C. § 1746 and 15 U.S.C. § 78u-4, and certify as follows

1.    I am fully authorized to enter into and execute this Certification on behalf of Plumbers & Steamfitters Local 267 Pension Fund  (the "Fund").

2.    The Fund did not invest with Bernard L. Madoff Investment Services ("BMIS") at the direction of counsel or in order to participate in any private action under the federal securities laws.

3.    I have reviewed the class action Complaint filed styled as *Plumbers & Steamfitters Local 267 Pension Fund, et al. v. J.P. Jeanneret Associates, Inc., et al.*, authorized its filing, and submit this certification as proof of the Fund's standing to bring this action.

4.    The Fund is willing to serve as lead plaintiff, including providing testimony at deposition and trial, if necessary.

5.    I have reviewed the records of the Fund's transactions with J.P. Jeanneret Associates, Inc. ("Jeanneret") and BMIS during the Class Period.  On July 1, 1996, the Fund entered into an investment contract with Defendant J.P. Jeanneret Associates, Inc.  Thereafter, Jeanneret allocated the Fund's assets in transactions that are set forth on the attached Schedule A.

6.    The Fund has sought to serve, and was appointed, as a lead plaintiff under the federal securities laws in two class actions captioned respectively, *In re Beacon Associates Litigation*, Master Civ. No. 09 civ. 0777 (S.D.N.Y. 2009), and *In re XM Satellite Radio Holdings Securities Litigation*, Civ. No. 06-0802 (D.D.C. 2007), during the last three years.

7.    The Fund will not accept payment for serving as a lead plaintiff beyond their pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) as ordered or approved by the Court.

8.    I declare under penalty of perjury that the foregoing is true and correct. Executed this /4 day of August, 2009.

By: _____

Title: _TRUSTEE_____

| | | | |
|---|---|---|---|
| **Schedule A** **P&S Local 267 Pension Fund** | | | |
| | | | |
| **Date** | **Amount Invested in BMIS** | **Redemptions** | |
| 07/31/96 | $ 1,400,000.00 | $ - | |
| 03/31/97 | 500,000.00 | | |
| 03/31/98 | 1,050,000.00 | | |
| 06/30/98 | 610,000.00 | | |
| 02/28/99 | 3,500,000.00 | | |
| 03/31/99 | 3,476,000.00 | | |
| 11/30/03 | | (500,000.00) | |
| 02/29/04 | | (500,000.00) | |
| | | | |
| | | | |
| | | | |
| **Stated Value As Of November 30, 2008** | | $ | **35,278,375.00** |